**RUSSELL BLAIR,** Plaintiff–Appellant, v. **BENJAMIN J. CAYETANO,** in his capacity as Lieutenant Governor of the State of Hawaii, Defendant–Appellee

NO. 16316

SEPTEMBER 17, 1992

LUM, C.J., MOON, KLEIN, AND LEVINSON, JJ.
AND INTERMEDIATE COURT OF APPEALS
CHIEF JUDGE BURNS, IN PLACE OF
WAKATSUKI, J., RECUSED

OPINION OF THE COURT BY MOON, J.

Pursuant to Hawaii Revised Statutes (HRS) § 602–5(3) [1] and Hawaii Rules of Appellate Procedure (HRAP) Rule 14, [2] this court accepted original jurisdiction over an action previously filed in the First Circuit Court by State Senator Russell Blair (Blair). Blair sued Lieutenant Governor Benjamin Cayetano (Cayetano), in his capacity as chief elections officer of the State of Hawaii, to enjoin him from placing on either the primary or the general election ballot two proposed constitutional amendments concerning changes in school governance purportedly adopted as Act 294 by the Hawaii State legislature during its 1992 session. Blair's principal contention is that Act 294 directs amendment to the Hawaii State Constitution in a manner contrary to article XVII, § 3 of the State Constitution. We agreed and therefore issued an order on September 2, 1992, enjoining Cayetano from placing the proposed amendments upon any election ballot, advising that this opinion would follow.

---

[1] Under HRS § 602–5(3), the supreme court has jurisdiction and power "[t]o entertain, in its discretion, any case submitted without suit when there is a question in difference which might be the subject of a civil action or proceeding in the supreme court, circuit court, or tax appeal court, and the parties agree upon a case containing the facts upon which the controversy depends[.]"

[2] HRAP 14(a), relating to the submission of agreed upon facts, provides:

Parties to a dispute which might be the subject of a civil action or proceeding addressed to the jurisdiction of the Hawaii appellate court, circuit court, district court, family court, land court, or tax appeal court may, without action, agree upon containing the facts upon which the controversy depends, a statement of the question or questions in difference, the contentions of the parties, and the form of judgment to be rendered.

## I. BACKGROUND

Article X, §§ 2 and 3 of the Hawaii State Constitution describe the governance structure of the State's public schools. Section 2 specifies the composition and manner of election of the State Board of Education (BOE), while § 3 describes the powers and duties of the BOE, including the power to appoint the Superintendent of Education.

During its 1992 session, the Hawaii State legislature passed House Bill No. 2123, which was subsequently signed into law by Governor John Waihee as Act 294. Act 294 includes alternative proposals for amending the school governance provisions of the State Constitution and outlines a procedure for allowing voters in the State's 1992 primary election to determine which of the two alternatives will be submitted for a ratification vote at the following general election. The first alternative proposes that the superintendent of education be appointed by the governor instead of by the BOE. The second alternative proposes that both the superintendent and the members of the BOE be appointed by the governor.

Specifically, the first alternative, § 2 of Act 294, sets forth the following language amending article X, § 3 of the State Constitution: [3]

### POWER OF THE BOARD OF EDUCATION

Section 3. The board of education shall have the power, as provided by law, to formulate [policy and to exercise control over the public school system through its executive officer, the superintendent of education, who shall be appointed by the board; except that the board] policy, set goals, and establish standards for the public school system. The superintendent of education shall be

---

[3] Material in brackets constitutes existing article X language which would be replaced by the underscored Act 294 proposed amendments.

appointed by the governor, with the advice and consent of the senate. The superintendent shall have jurisdiction and control over the internal organization, operations, and management of the public school system, as provided by law, and shall exercise [its jurisdiction] such authority in a manner consistent with general laws.

The second alternative, set forth in § 4 of Act 294, amends both §§ 2 and 3 of article X as follows:

### BOARD OF EDUCATION

Section 2. There shall be a board of education composed of members who shall be [elected in a nonpartisan manner by qualified voters, as provided by law, from two at–large school board districts.] appointed by the governor from two school board districts, with the advice and consent of the senate.

### POWER OF THE BOARD OF EDUCATION

Section 3. The board of education shall have the power, as provided by law, to formulate [policy and exercise control over the public school system through its executive officer, the superintendent of education, who shall be appointed by the board; except that the board] policy, set goals, and establish standards for the public school system. The superintendent of education shall be appointed by the governor, with the advice and consent of the senate. The superintendent shall have jurisdiction and control over the internal organization, operations, and management of the public school system, as provided by law, and shall exercise [its jurisdiction] such authority in a manner consistent with general laws.

Additionally, § 6 of Act 294 provides that:

In conjunction with the 1992 primary election, the lieutenant governor shall submit the following two sepa-

rate questions to the electorate with instructions that each voter select one of the two questions:

1. Shall the board of education's powers be limited to formulating policy, setting goals, and establishing standards for the public schools; and shall the superintendent be appointed by the governor, with the advice and consent of the senate?

2. Shall the board of education be appointed by the governor, with the advice and consent of the senate; the board of education's powers be limited to formulating policy, setting goals, and establishing standards for the public schools; and the superintendent be appointed by the governor, with the advice and consent of the senate?

Finally, § 7 of Act 294 specifies that the alternative which is selected by a plurality of primary election voters will be placed on the 1992 general election ballot for ratification by the voters pursuant to article XVII of the State Constitution:

[the first alternative proposal] of this Act shall take effect only if the first question posed to the electorate pursuant to § 6 of this Act receives the most votes cast. [The second alternative proposal] of this Act shall take effect only if the second question posed to the electorate pursuant to § 6 of the Act receives the most votes cast.

Thus, although Act 294 includes two separate alternative proposals for constitutional amendments, the Act provides that only one of these alternatives will actually be presented to the voters at the general election, depending on which of the two questions receives the most votes at the primary election.

## II. STANDARD OF REVIEW

This court accepted original jurisdiction of this matter, and therefore, there is no standard of review as such. However, where it is alleged that the legislature has acted unconstitutionally, this

court "[has] consistently held . . . that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. . . . [T]he infraction should be plain, clear, manifest, and unmistakable." *Schwab v. Ariyoshi*, 58 Haw. 25, 31, 564 P.2d 135, 139 (1977) (citations omitted).

Thus, in the instant case, Blair has the burden of demonstrating that Act 294 is a plain, clear, manifest, and unmistakable violation of the procedure set forth in article XVII, § 3 of the Hawaii State Constitution.

## III. DISCUSSION
### A.

Article XVII, § 3 of the Hawaii State Constitution provides:

AMENDMENTS PROPOSED BY LEGISLATURE

Section 3. *The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two–thirds vote of each house on final reading at any session,* after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, *by a majority vote of each house on final reading at each of two successive sessions.*

Upon such adoption, the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.

*At such general election the proposed amendments shall be submitted to the electorate for approval or rejection* upon a separate ballot.

The conditions of and requirements· for ratification of such proposed amendments shall be the same as provided in Section 2 of this article for ratification at a general election.

(Emphasis added.)

The language of § 3's first paragraph sets forth the procedure by which the legislature may propose amendments to the State Constitution, and the language is clear and unambiguous. The legislature "may propose amendments . . . by adopting the same" in either of two expressly stated ways: 1) "by a two–thirds vote of each house on final reading at any session;" or 2) "by a majority vote of each house on final reading at each of two successive sessions."

"The general rule is that, if the words used in a constitutional provision . . . are clear and unambiguous, they are to be construed as they are written." *Spears v. Honda*, 51 Haw. 1, 6, 449 P.2d 130, 134 (1968). Additionally, the constitutional provision at issue sets forth a specific procedure for amending the constitution itself. Although this is a case of first impression in Hawaii, many other jurisdictions faced with this precise issue have held that the provisions of a constitution which regulate its own amendment are not merely directory, but mandatory. "[S]trict observance of every substantial requirement is essential to the validity of the proposed amendment." *Andrews v. Governor of Maryland*, 294 Md. 285, 289, 449 A.2d 1144, 1146 (1982) (citation omitted); *see also Coleman v. Pross*, 219 Va. 143, 154, 246 S.E.2d 613, 620 (1978); *McWhirter v. Bridges*, 249 S.C. 613, 618, 155 S.E.2d 897, 899 (1967); *Moore v. Brown*, 350 Mo. 256, 263, 165 S.W.2d 657, 659–60 (1942) ("[I]t is fundamental that the people, themselves, are bound by their own Constitution[.] Where they have provided

therein a method for amending it, they must conform to that procedure. Any other course would be ***revolutionary* . . . ."** (emphasis in original)).

Article XVII, § 3 clearly sets forth a two–step procedure for the adoption and ratification of proposed constitutional amendments: 1) adoption by legislative vote; and 2) submission to the electorate for approval or rejection at "the next general election." There is simply no provision for any participation by the primary election voters in the adoption phase. The one and only action clearly required for the adoption of a proposed constitutional amendment is a legislative vote.

Cayetano asserts that "each of [the proposed amendments] was considered and adopted by the legislature[.]" On the other hand, Blair contends that "[i]n using the contingency of the primary election to eliminate one of its alternative proposals, the Legislature failed to reach an unqualified agreement that either proposal should be submitted for ratification."

Based on our review of the record, we find no indication that the legislature specifically adopted each alternative as a proposed amendment as mandated by article XVII, § 3. According to the provisions of the Act, actual adoption of one or the other alternative must await the primary election results. Thus, what the legislature "adopted" was the method or procedure to determine which alternative would be presented for ratification on the general election ballot. Article XVII, § 3 is utterly devoid of any provision that allows the legislature to condition the passage of a proposed amendment upon its actual adoption at a subsequent primary election. Such a practice is directly contrary to the unambiguous mandate of article XVII, § 3.

Moreover, the original drafters of article XVII intentionally created a division between the proposing of amendments by the people's representative assembly, the legislature, and the electorate's approval or rejection of the proposed amendments. This

intention is explicitly stated in Standing Committee Report No. 48 of the 1950 Constitutional Convention:

Generally speaking, the constitutions of the states distinguish between *two separate processes* in the revision or amendment of such constitutions. The first process may properly be referred to as "initiation" or "proposal" of amendments or revision, and the second process as "adoption" or "ratification" of such proposed amendments or revisions.

Three methods of initiating or proposing amendments or revisions are recognized in the various state constitutions. They are: (1) proposal by the legislature; (2) proposal by a constitutional convention; and (3) proposal by popular initiative.

Also, three methods of adopting amendments are recognized in the various states. They are: (1) adoption by the legislature; (2) adoption by constitutional conventions, when such conventions have been assembled to consider revisions or amendments; and (3) adoption by direct popular vote.

Your Committee was in general agreement that the method of adoption or ratification of an amendment or revision should be only by direct popular vote and has so provided in the proposal herewith submitted.

However, *with regard to initiation or proposal of amendments and revision, your Committee firmly felt that there should be only two prescribed methods, namely, (1) by constitutional convention, and, (2) by the legislature*.

Stand. Comm. Rep. No. 48, in *Proceedings of the Constitutional Convention of Hawaii* of 1950 at 186–87 (1960) (emphasis added).

Thus, in addition to violating the express intent of article XVII, § 3 to leave the electorate–at–large out of the initiation/proposal process, Act 294 actually allows the primary election voters to veto one of two alternative proposals, which is in direct contravention of the intent of § 3's original drafters.

### B.

The main thrust of Cayetano's argument for upholding the Act 294 procedure focuses on the dependent phrase in article XVII, § 3's first paragraph: "in the manner required for legislation." Cayetano contends that this one phrase should be construed to allow any sort of procedure that the legislature has in fact included in other types of past legislation. Cayetano further argues that to disallow the Act 294 procedure is to "completely ignore[] [article XVII, § 3's] grant of authority to the legislature to propose amendments 'in the manner required for legislation.' "

The dependent phrase "in the manner required for legislation" merely modifies and supplements the main declarative statement to insure that the usual legislative procedures[4] are followed for any proposed constitutional amendment, as they must be for other types of legislation. The phrase must not be construed to allow for procedures so obviously at odds with the express language that it actually supplements. Article XVII, § 3 would itself have to be

---

[4] In the normal legislative process, bills are referred to one or more standing committees for consideration. The Hawaii Constitution requires that every committee meeting held for the purpose of making a decision on matters referred to the committee be open to the public. Committee reports are to accompany bills reported back to the floor of a house from the relevant committee. Legislative bills must pass through three readings in each house on separate days. Haw. Const. art. III, § 15; *see generally* Hawaii Legislators' Handbook, at 30–42 (1990).

significantly amended in order to allow the kind of open–ended grant of legislative authority that Cayetano suggests.

Cayetano attempts to analogize the Act 294 primary vote procedure to other types of routine legislation, such as appropriations bills. In fact, the three specific examples Cayetano proffers were all appropriations bills in which the legislature essentially conditioned payment of appropriated money on the occurrence of some subsequent event.[5] Cayetano contends that the primary vote mechanism of Act 294 serves as such a conditioning event. Therefore, Cayetano submits that Act 294 must pass muster because 1) the legislature routinely passes bills with conditioning events; and 2) Act 294 was passed in a form similar to other laws. Consequently, Cayetano concludes that Act 294 was adopted in "the manner required for legislation."

Cayetano simply misreads the clear language of the first paragraph of article XVII, § 3 and disregards the intent of the original drafters to exclude the electorate–at–large from the initiation/proposal process. Moreover, analogies to other types of more routine legislation such as fiscal appropriations are misplaced. The issue before us concerns legislatively proposed constitutional amendments which are controlled by a specific constitutional

---

[5] The three specific examples cited are: (1) HRS § 346–53, entitled "Determination of amount of assistance," where examination of the federal poverty level is the external condition precedent that must occur before the Department of Human Services can determine what income level qualifies a family for financial assistance; (2) House Bill No. 2454, House Draft 1, Senate Draft 1, Conference Draft 1, adopted by the Sixteenth Legislature during the 1992 Special Session relating to special fund appropriation for Kapalua airport with a proviso indicating that appropriation will be made only if the Department of Transportation is able to obtain title or lease to the airport property; and (3) Section 13 of Act 184, 1990 Session Laws of Hawaii, which states that the Act would take effect "only if a bill establishing the transit capital development fund . . . becomes an Act" and upon the submission and legislative approval of a development agreement.

provision. The express language of article XVII, § 3 is plain and unambiguous and thus controls.

## C.

Finally, Blair argues that the Act 294 procedure constitutes an unlawful voter referendum because leaving to the primary election voters the decision as to which of the two alternative proposals will survive and be placed on the general election ballot is an impermissible delegation of the legislature's authority to the electorate. We agree. In our system of representative government, it is axiomatic that the legislature, as the people's elected representative assembly, is entrusted with both the authority and responsibility for basic policymaking.

In *Hart v. Paulus*, 296 Or. 352, 676 P.2d 1384 (1984), the Oregon Supreme Court ruled on a legislative scheme for proposed constitutional amendments similar to that of the case at bar. Oregon's legislature had stipulated that its proposed constitutional amendments not be submitted to the electorate for ratification unless local government units representing a majority of the state population and a majority of such government units requested placement of the proposed amendments on the ballot. *Id.* at 354–55, 676 P.2d at 1385.

In holding that the scheme violated Oregon's constitution, which is legislatively amended by a process similar to Hawaii's, the Oregon Supreme Court used language which we believe articulates the essential flaw in the hybrid procedure mandated by Act 294:

The constitution is the basic charter of state government . . . . It therefore is essential that the Legislative Assembly itself reach agreement on the important question whether to submit to the people a proposal to amend

their constitution. A decision to submit an amendment only upon the intervening "request" or "application" of third parties . . . contravenes the clear responsibility of the Legislative Assembly to decide for itself whether referral of the proposed amendment will or will not best serve the constitution of the state.

*Id.* at 360–61, 676 P.2d at 1388–89.

Pursuant to the clear mandate of article XVII, § 3, the electorate is to perform only a ratification function, by voting at the general election either to approve or reject a proposed constitutional amendment which has been adopted by the legislature. When performing their ratification function, the people are entitled to receive a proposal which their representative and deliberative body has unconditionally agreed is worthy of a ratification vote.

Cayetano agrees that if the primary election element of Act 294 did constitute a voter referendum, it would be unlawful and an impermissible delegation of authority. However, he contends that "the legislature is merely soliciting voter opinion and preference in conjunction with the primary election[,]" through the Act 294 procedure. Cayetano maintains that the primary election vote element of Act 294 "is nothing more than an appropriate use of the 'opinion poll' or 'advisory referendum' by the legislature." He claims that the primary vote is "advisory only." These contentions cannot survive scrutiny.

There is simply no rational basis upon which the primary election component of Act 294 can be considered advisory only, or "merely" an opinion poll. If the only role voters in the primary election under Act 294 were meant to have is to give their advice or their opinion on the proposed amendments, then no mandatory consequences should attend their vote. However, Act 294 requires that one of the alternatives be eliminated based upon the results of the primary and not placed on the subsequent general election ballot. With such mandatory consequences, it is untenable to main-

tain that the primary election component of Act 294 is in any sense advisory.

We conclude that the primary election element of Act 294 would constitute an unlawful referendum and an impermissible delegation of legislative authority to the electorate. Such delegation of authority would vitiate the premise that the legislature must not abdicate its ultimate responsibility for policymaking.

In the event this court agreed that Act 294 was unconstitutional because of the primary election procedure, Cayetano proposed that we allow both alternatives to be placed on the general election ballot only. We decline to do so because, as previously stated, there is no evidence in the record to indicate that either or both alternatives were processed "in the manner required for legislation" by having garnered "a two–thirds vote of each house on final reading" or "by a majority vote of each house on final reading at each of two successive sessions," as mandated by article XVII, § 3. Had both conflicting alternatives been passed by the legislature in compliance with the mandate of article XVII, § 3, we conclude that it would have been constitutionally appropriate to submit both alternatives to the electorate for ratification at the general election pursuant to article XVII, § 5.[6] Thus, because neither alternative in Act 294 received the necessary support of the legislature, neither one is entitled to be considered by the electorate at the general election.

## IV. CONCLUSION

Act 294 violates the constitutional mandate contained in article XVII, § 3 of the Hawaii State Constitution beyond a reasonable

---

[6] Article XVII, § 5, in pertinent part, provides that if conflicting amendments or revisions are proposed, and "both are approved, then the amendment receiving the highest number of votes shall prevail."

doubt. Consequently, Cayetano is enjoined from placing the amendments proposed in Act 294 upon any election ballot.

*Russell Blair*, on the brief, plaintiff–appellant pro se.

*Patricia Green Riley*, *Russell A. Suzuki*, and *Charleen M. Aina*, on the brief, Deputy Attorneys General, for defendant–appellee.