932 P.2d 316

STATE of Hawai'i, ex rel. Margery S. BRONSTER, Attorney General of the State of Hawai'i, Plaintiff–Appellant,

v.

Dwayne D. YOSHINA, Chief Election Officer of the State of Hawai'i; Paul T. Kawaguchi, Clerk of the Senate of the State of Hawai'i; and Patricia Maushimizu, Clerk of the House of Representatives of the State of Hawai'i, Defendants–Appellees.

No. 19940.

Supreme Court of Hawai'i.

Jan. 28, 1997.

180

Dorothy Sellers and Ted Gamble Clause, Deputy Attorneys General, on the briefs, Honolulu, for plaintiff-appellant.

Jon M. Van Dyke and Robert J. Morris, on the briefs, Honolulu, for defendants-appellees Paul T. Kawaguchi and Patricia Mau–Shimizu.

James C. Paige, Deputy Attorney General, on the briefs, Honolulu, for defendant-appellee Dwight D. Yoshina.

Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and LIM, Circuit Judge, in place of MOON, C.J., Recused.

KLEIN, Acting Chief Justice.

This appeal concerns the interpretation of article XVII, section 3 of the Hawai'i Constitution, which pertains to amending the constitution. The State of Hawai'i, through its attorney general, filed a complaint seeking (1) a declaratory judgment that certain proposed constitutional amendments put before the voters in 1994 had passed the legislature without proper notice to the governor, and (2) injunctions preventing certification of the election results on those amendments by Dwayne D. Yoshina, the chief election officer, and the clerks of the Senate and the House (collectively, "Defendants"). The circuit court dismissed for lack of jurisdiction, and held in the alternative that the proposed amendments had passed the legislature in conformity with the constitution. We reverse the court's jurisdictional holding, but otherwise affirm.

## I. BACKGROUND

Article XVII, section 3 of the Hawai'i Constitution details the procedure for the passage of proposed constitutional amendments. The legislature may approve such an amend-

ment by either of two methods: (1) in a single legislative session, both houses may approve the proposal by a two-thirds vote; or (2) the proposal may be passed by simple majority vote at two successive sessions. Article XVII, section 3 reads, in pertinent part:

> SECTION 3. The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after *either or both* houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.

(Emphasis added.)[1] The governor has no power to veto a proposed amendment, regardless of which method is used by the legislature. *See* article XVII, section 4.

At issue in this case is the timing of the notice to the governor pursuant to the procedure for adoption of proposed constitutional amendments in a single session. Specifically, this court is asked to declare that a number of constitutional amendments proposed by the 1994 legislature were not lawfully submitted to the electorate due to insufficient notice. The attorney general insists that *each* house, prior to voting, must give the governor ten days notice of the final form of any proposed amendment. Additionally, the attorney general asks us to enjoin Yoshina from certifying the 1994 election results on those amendments, and to enjoin the Senate and House clerks from certifying that any future proposed constitutional amendment meets the requirements of the Hawai'i Con-

stitution, article XVII, section 3 unless ten days notice is given to the governor before each legislative chamber votes on the final form of the proposal.

According to the undisputed facts submitted by the parties, the Hawai'i Constitution has been amended forty-six times by legislative proposal pursuant to article XVII, section 3 since the constitution took effect August 21, 1959; in all but one instance, the "single-session, two-thirds vote" method has been followed. The groundwork for this lawsuit began to be laid in 1990, when the governor and the attorney general publicly took the position, based on their interpretation of the constitution, that notice was required from both houses. *See* Richard Borreca, "3 constitutional amendments in dispute are on voters ballots," *Honolulu Star–Bulletin*, Nov. 5, 1990. The governor reiterated this stand in 1992, when the legislature again followed the single-session procedure for placing constitutional amendments before the voters.

In 1994, the legislature passed six bills, containing eight proposed amendments to the Hawai'i Constitution. Four of the bills, S.B. No. 2182, S.B. 2294, S.B. 2513, and S.B. 2515, concerned the judicial selection and confirmation process. H.B. 3657 related to the powers of the Board of Education, and H.B. 2692 (Act 280) concerned the financing of child care. In an August 4, 1994 memorandum to the lieutenant governor, the attorney general gave his opinion that S.B. 2513—concerning Judicial Selection Commission terms—had "not yet fulfilled the requirements under article XVII, section 3 of the Hawai[']i Constitution." The attorney gener-

---

1. Article XVII, section 3 reads in full:
AMENDMENTS PROPOSED BY LEGISLATURE
SECTION 3. The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.
Upon such adoption, the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.
At such general election the proposed amendments shall be submitted to the electorate for approval or rejection upon a separate ballot.
The conditions of and requirements for ratification of such proposed amendments shall be the same as provided in section 2 of this article for ratification at a general election.
HI. CONST. Art. XVII, § 3.

al recommended that the lieutenant governor withhold the amendment from the ballot for the upcoming election.[2] By letters dated August 5 and August 15, the attorney general took the same position vis-a-vis S.B. 2294 (nominations to the Judicial Selection Commission) and Act 280 (educational revenue bonds).

The lieutenant governor informed the president of the Senate and the speaker of the House of the attorney general's concerns on August 24, 1994. In a September 9 letter, the clerks of the House and the Senate certified that "the constitutional notice requirements were met for the above-referenced bills." On September 12, the lieutenant governor forwarded this letter to the attorney general and took the position that his office "has no choice but to place the proposed constitutional amendments contained in the aforementioned bills on the November 1994 ballot." He suggested that the attorney general take expedited legal action to resolve any remaining concerns, because the ballots were then in the process of being printed.

On September 22, 1994, the attorney general sent a memorandum to the lieutenant governor, the president of the Senate and the speaker of the House, informing them of the plan for the litigation that was then impending:

> Once we have determined the agreed upon facts, we plan to file suit no earlier than Wednesday, November 9, 1994, against the Lieutenant Governor to enjoin the certification of voting results on the proposed constitutional amendments and against the Clerks of the Senate and of the House of Representatives to enjoin the certification of fulfillment of constitutional notice requirements for bills that have not met the ten-day notice requirement. We plan to file suit after the general election of 1994 because the constitutional amend-

ment ballots are already being printed and, as a practical matter, the amendments are contained in the disputed bills and cannot be 'kept off the ballot' at this time. Moreover, since the proposed constitutional amendments will be on the ballots, we do not wish to discourage the ratification vote on the substantive contents of the proposed amendments by publicizing before the general election the potential invalidity of the ratification vote, especially if the Supreme Court rules that the constitutional notice requirements were met.

Seven of the proposed constitutional amendments were approved by the voters at the November 8, 1994 election.[3] On November 21, 1994, the attorney general filed a complaint in the First Circuit Court, naming as defendants the lieutenant governor as well as T. David Woo, Jr., clerk of the Senate, and Patricia Mau–Shimizu, clerk of the House of Representatives. The case was submitted on undisputed facts. The clerks moved jointly to dismiss and/or for summary judgment; the attorney general also moved for summary judgment.

On May 20, 1996, the trial court granted the clerks' motion. Resting its order on several alternative grounds, the court ruled that the state's challenge amounted to an "election contest," and the circuit courts therefore had no jurisdiction because "[a]ny challenge or contest to the validity of the results of the election is governed by Hawai'i Revised Statutes [HRS] sections 11–171, 11–172, and 11–174.5[,]" which pertain to election contests; in the alternative, the court ruled that "all such requirements [of article XVII, section 3] have been fully complied with as to all six (6) amendments[.]"[4] The attorney general's complaint for declaratory judgment was dismissed with prejudice for lack of jurisdiction; the requested injunc-

---

2. At that time, HRS § 11–2 provided that the lieutenant governor was the chief election officer. HRS Chapter 11 was amended in 1995 to provide for a separate Office of Elections, headed by a chief election officer. *See* HRS §§ 11–1.5 and –1.6 (Supp.1996).

3. One of two proposed changes to the Board of Education was rejected by the voters.

4. The trial court additionally ruled that, because the certification of election results is a ministerial act and not a "violation" of any law, it had no jurisdiction to enjoin the certification by either the lieutenant governor or the legislative clerks because HRS § 603–23 grants the court the power only to "enjoin or prohibit *any violation of the laws* of the State[.]" (Emphasis added.) Because of our disposition of the merits of this appeal, we need not reach this issue.

tions were denied. The attorney general took this timely appeal on behalf of the state.

## II. *DISCUSSION*

### A. *Subject Matter Jurisdiction*

■ As a threshold matter, we must determine that we have subject matter jurisdiction over this appeal. A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable *de novo*. *Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 239, 842 P.2d 634, 637 (1992), *aff'd, Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

Our review is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Id.* (quoting *Love v. United States*, 871 F.2d 1488, 1491 (9th Cir.1989)).

■ The circuit court held that it was without jurisdiction because the state's cause of action was an "election contest" and, thus, under HRS Chapter 11, had to be filed as an original action in the Supreme Court within twenty days of the election. We disagree.

### 1. *General jurisdictional provisions*

The jurisdictional powers of the circuit courts are broadly defined in HRS Chapter 603. HRS section 603–21.5 provides that the circuit courts "shall have jurisdiction, except as otherwise expressly provided by statute, of ... [c]ivil actions and proceedings[.]"[5]

And under section 603–23, the circuit courts are empowered *"to enjoin or prohibit any violation of the laws of the State ... upon application of the attorney general [.]"*[6] (Emphasis added.) Finally, section 603–21.7(b) broadly defines circuit court jurisdiction in certain non-jury cases:

The several circuit courts shall have jurisdiction, without the intervention of a jury except as provided by statute, as follows:

. . .

(b) Of actions or proceedings in or in the nature of habeas corpus, prohibition, mandamus, quo warranto, and all other proceedings in or in the nature of applications for writs directed to courts of inferior jurisdiction, to corporations and individuals, as may be necessary to the furtherance of justice and the regular execution of the law.

HRS § 603–21.7(b) (1993).

There is no dispute that the attorney general could have brought this action in circuit court *prior* to the election, pursuant to HRS sections 603–23 and 603–21.7(b). Defendants concede that, "in other circumstances, under the general provisions of Chapter 603, the Circuit Court might have been considered to be 'a court of competent jurisdiction.'" Answering Brief at 27. Thus, Defendants' argument, and the trial court's holding, depend on the fact that the attorney general waited until after the election to file suit. However, the relevant statutes do not support this conclusion.

### 2. *Jurisdiction over election contests*

HRS Title 2, Chapter 11 covers "Elections, Generally"; Part XI of Chapter 11 pertains

---

**5. § 603–21.5 General**
The several circuit courts shall have jurisdiction, except as otherwise provided by statute, of:
(1) Criminal offenses cognizable under the laws of the State, committed within their respective circuits or transferred to them for trial by change of venue from some other circuit court;
(2) Actions for penalties and forfeitures incurred under the laws of the State;
(3) Civil actions and proceedings, in addition to those listed in sections 603–21.6, 603–21.7, and 603–21.8.
HRS § 603–21.5 (1993).

**6. § 603–23 Injunction of violation of laws and ordinances.**
The circuit courts shall have power to enjoin or prohibit any violation of the laws of the State, or of the ordinances of the various counties, upon application of the attorney general, the director of the office of consumer protection, or the various county attorneys, corporation counsels, or prosecuting attorneys, even if a criminal penalty is provided for violation of the laws or ordinances. Nothing herein limits the powers elsewhere conferred on circuit courts.
HRS § 603–23 (1993).

to "Election Contests." Pursuant to HRS section 11-171, "[t]his part shall apply whenever a contested election is subject to determination by a court of competent jurisdiction in the manner provided by law." Section 11-172—entitled "Contests for cause; generally"—specifies which parties are eligible to bring such an action, where it must be brought, and suggests the nature of the kinds of complaints covered:

> With respect to any election, any candidate, or qualified political party directly interested, or any thirty voters of any election district, may file a complaint in the supreme court. *The complaint shall set forth any cause or causes, such as but not limited to, provable fraud, overages, or underages, that could cause a difference in the election results.* The complaint shall also set forth any reasons for reversing, correcting, or changing the decisions of the precinct officials or the officials at a counting center in an election using the electronic voting system....

(Emphasis added.) Finally, section 11-174.5 sets out the procedures to be followed in challenging an election, including the requirement that "the complaint shall be filed in the office of the clerk of the supreme court not later than 4:30 p.m. on the twentieth day following the general, special general, or special election[.]" [7]

Defendants insist that the instant appeal is an "election contest" and should have followed this procedure. They emphasize the limitation on the general grant of circuit court jurisdiction in HRS section 603-21.5 ("except as otherwise expressly provided by statute"). By enacting the specific jurisdictional requirements of HRS Chapter 11, Defendants argue, the legislature divested the circuit courts of their jurisdiction under the more general provisions of Chapter 603.

It is true that HRS Chapter 11 is more specific than the general jurisdictional provisions empowering the circuit courts. But it does not divest those courts of jurisdiction over causes of action which do not fall within its ambit. HRS section 11-172 governs challenges to election *results;* this case raises a question of constitutional *procedure.* The attorney general does not "contest" an "election," but rather seeks to resolve the meaning of a constitutional provision pursuant to which the legislature may propose amendments to the constitution and place them before the voters. The fact that such a dispute comes before the courts subsequent to the election at which the disputed amendments were voted upon does not convert the dispute into a "contest" over the result of that election.

■ Under HRS section 603-21.5, the circuit courts have jurisdiction "over all civil causes of action unless precluded by the State Constitution or by statute." *Sherman v. Sawyer,* 63 Haw. 55, 58, 621 P.2d 346, 349 (1980). Clearly, the trial court had jurisdiction under this statute to consider the attorney general's request for a declaratory judgment and related injunctions. We hold that the circuit court had jurisdiction in this action.

### B. *Standing*

A further prerequisite to our reaching the merits of this appeal is that the attorney general have standing to bring the complaint in the first instance.

As a general rule, whether a party has standing is measured by the three part "injury in fact" test: (1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable

---

7.   § 11-174.5   **Contests for cause in general, special general, and special elections.** (a) In general, special general, or special elections, the complaint shall be filed in the office of the clerk of the supreme court not later than 4:30 p.m. on the twentieth day following the general, special general, or special election and shall be accompanied by a deposit for costs of court as established by rules of the supreme court. The clerk shall issue to the defendants named

in the complaint a summons to appear before the supreme court not later than 4:30 p.m. on the tenth day after service thereof.
HRS § 11-174.5(a) (1993). Paragraph (b) sets out the procedure for the hearing in the Supreme Court, mandating amongst other things that "the complaint shall be heard by the supreme court in which the complaint was filed as soon as it reasonably may be heard."

decision would likely provide relief for a plaintiff's injury.

*Bush v. Watson*, 81 Hawai'i 474, 479, 918 P.2d 1130, 1135, *reconsideration denied*, 82 Hawai'i 156, 920 P.2d 370 (1996).

At issue here is whether either the attorney general or the State of Hawai'i—on whose behalf this appeal was brought—has suffered any injury as a result of the legislature's alleged failure to comply with article XVII, section 3. The notice provision of that article is designed to benefit not the state, but the office of the governor. And a governor could waive the right to receive ten days notice by not raising the objection.

■ Practically speaking, however, for the purposes of this appeal, the fact that the attorney general brought this action in the name of the state rather than in the name of the governor represents a distinction without a difference. On the record before us, we have no reason to believe that the governor did not authorize the attorney general to represent him in this action. Furthermore, as we have often stated, standing barriers should not serve to bar cases of public interest under our jurisdiction. More specifically, "federal justiciability standards are inapplicable in state court declaratory judgment actions involving matters of great public importance[.]" *Bush*, 81 Hawai'i at 479, 918 P.2d at 1135 (quoting *Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 204–05, 891 P.2d 279, 291–92, *cert. denied*, —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995)); *see also Pele Defense Fund v. Paty*, 73 Haw. 578, 592, 837 P.2d 1247, 1257 (1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 176, 623 P.2d 431, 439 (1981) (the "touchstone" of our standing requirements is the "needs of justice"). Given the significant public importance of this issue, which is likely, if not certain, to recur, we hold that the attorney general has standing to raise the claims in this action.

### C. *The Attorney General Is Not Barred By Laches*

■ Defendants further suggest that the equitable doctrine of laches should bar the

attorney general from the relief she seeks. We disagree.

■ In the context of an election contest, "[t]he general rule is that if there has been opportunity to correct any irregularities in the election process or in the ballot prior to the election itself, plaintiffs will not, in the absence of fraud or major misconduct, be heard to complain of them afterward." *Lewis v. Cayetano*, 72 Haw. 499, 502–03, 823 P.2d 738, 741 (1992) (quoting *Thirty Voters of County of Kauai v. Doi*, 61 Haw. 179, 181–82, 599 P.2d 286, 288–89 (1979)). For substantially the same reasons that we have held this action not to be an "election contest," however, this doctrine does not apply to the present case.

In *Lewis*, a group of voters challenged the manner in which the county clerk joined a pair of council resolutions on the ballot. Although objections were raised prior to the election, the suit was not initiated until after the voting was concluded. Relying on the above-quoted language from *Doi*, we declined to hear their challenge:

> We apply the doctrine of laches in cases such as this and *Thirty Voters v. Doi* because efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process.

*Lewis*, 72 Haw. at 503, 823 P.2d at 741. The circumstances in *Doi* were similar, with disgruntled voters waiting until after an election to challenge the language used on a ballot. 61 Haw. at 181–82, 599 P.2d at 288.

Here, in contrast, the attorney general does not seek to correct "irregularities in the election process or in the ballot." And while the better practice would have been to expedite legal action prior to the election, *see Blair v. Cayetano*, 73 Haw. 536, 836 P.2d 1066, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992), the attorney general's decision to wait simply cannot be characterized as a "gamble on the outcome of the election contest" because the voters' approval or disapproval of the constitutional amend-

186

ments in this case in no way resolves the underlying dispute regarding the correct procedure for their adoption by the legislature.

D. *The Attorney General Has Failed To Show A Plain, Clear, Manifest, and Unmistakable Violation Of Article XVII, Section 3*

### 1. *Standard of Review*

■ In alternatively ruling on the merits of this appeal, the trial court granted summary judgment in favor of Defendants.

> On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Harris v. DeSoto,* 80 Hawai'i 425, 431, 911 P.2d 60, 66 (1996) (quoting *Heatherly v. Hilton Hawaiian Village Joint Venture,* 78 Hawai'i 351, 353, 893 P.2d 779, 781, *amended on reconsideration in part,* 78 Hawai'i 474, 896 P.2d 930 (1995)). The evidence must be viewed in the light most favorable to the non-moving party. *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

■ "[W]here it is alleged that the legislature has acted unconstitutionally, this court '[has] consistently held ... that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt.... [T]he infraction should be plain, clear, manifest, and unmistakable.'" *Blair,* 73 Haw. at 541–42, 836 P.2d at 1069 (quoting *Schwab v. Ariyoshi,* 58 Haw. 25, 31, 564 P.2d 135, 139 (1977)). The interpretation of article XVII, section 3 is a question of law. *See Pray v. Judicial Selection Comm'n,* 75 Haw. 333,

340, 861 P.2d 723, 727 (1993). Thus, in this case, the state has the burden of demonstrating that the procedure followed by the legislature in adopting the six challenged bills was a plain, clear, manifest, and unmistakable violation of article XVII, section 3 of the Hawai'i Constitution.

"When resolving ambiguity, we have repeatedly held that the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it." *Pray,* 75 Haw. at 343, 861 P.2d at 728 (quoting *Cobb v. State,* 68 Haw. 564, 565, 722 P.2d 1032, 1033 (1986)). Furthermore, "we are to be guided by the cardinal principle of judicial review that constitutional amendments ratified by the electorate will be upheld unless they can be shown to be invalid beyond a reasonable doubt. The burden of showing this invalidity is upon the party challenging the results of the election." *Kahalekai v. Doi,* 60 Haw. 324, 331, 590 P.2d 543, 549 (1979) (citations omitted).

■ While *Blair* is not dispositive of the issue before us, that case did concern article XVII, section 3, and we set forth certain general rules to be applied to the interpretation of constitutional provisions and to the process of constitutional amendment. "The general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written." *Blair,* 73 Haw. at 543, 836 P.2d at 1070 (quoting *Spears v. Honda,* 51 Haw. 1, 6, 449 P.2d 130, 134 (1968)). "[S]trict observance of every substantial requirement is essential to the validity of the proposed amendment." *Id.* at 543, 836 P.2d at 1070 (quoting *Andrews v. Governor of Maryland,* 294 Md. 285, 449 A.2d 1144, 1146 (1982)); *see also Kahalekai; In re Proposed Amendment to the Constitution,* 11 Haw. 339 (1898).

■ As noted above, the state's position is that article XVII, section 3 unmistakably requires ten days notice from *each* chamber prior to that chamber's voting on a proposed constitutional amendment. Defendants contend that the constitution requires only that *either* house provide ten days notice. In determining the meaning of a consti-

tutional provision, our starting point is naturally the language itself. *See Pray,* 75 Haw. at 340, 861 P.2d at 727; *Blair,* 73 Haw. at 542–43, 836 P.2d at 1070.

In *Blair,* we faced a challenge to an unusual procedure for proposing an amendment to the state constitution. The legislature passed two alternative amendments and placed them both on the primary election ballot, in order that the voters could decide which one should be presented for final approval at the general election. We found this procedure unconstitutional under article XVII, section 3. *Blair,* 73 Haw. at 550–51, 836 P.2d at 1073–74. In that case, the lieutenant governor argued that, because the legislature had used similar procedures to enact regular legislation, such an approach was approved by the constitution's allowance that proposed constitutional amendments were to be adopted "in the manner required for legislation[.]" In language with some relevance to the dispute now before us, we disagreed:

> The dependent phrase "in the manner required for legislation" merely modifies and supplements the main declarative statement [of article XVII, section 3] to insure that the usual legislative procedures are followed for any proposed constitutional amendment, as they must be for other types of legislation. The phrase must not be construed to allow for procedures so obviously at odds with the express language that it actually supplements.

*Id.* at 546, 836 P.2d at 1071–72 (footnote omitted).

The attorney general's argument here, focused on two isolated clauses in the same sentence—"by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice ...."—attempts to sidestep both the language and the structure of article XVII, section 3. It is indeed unclear why, if notice was to be required of both legislative chambers, the constitutional framers chose the phrase "either or both." The meaning of this phrase is clear and unambiguous. Had the attorney general's interpretation been preferred, the

framers could easily have required notice from both legislative chambers.

Furthermore, article XVII, section 3 provides that the legislature propose amendments to the constitution "by *adopting* the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice...." (Emphasis added.) And like the language disputed in *Blair,* each of the two clauses focused on here by the state modifies and supplements the article's main declarative statement. As we held in *Blair,* "Article XVII, § 3 clearly sets forth a two-step procedure for the adoption and ratification of proposed constitutional amendments: 1) adoption by legislative vote; and 2) submission to the electorate for approval or rejection at the next general election." 73 Haw. at 544, 836 P.2d at 1070 (internal quotation marks omitted). "Adoption," in this context, clearly means more than the action of either house alone, but the legal consequence of the joint passage by the whole legislature of a proposed amendment by the proscribed procedure. A single chamber cannot "adopt" an amendment; adoption of a proposed constitutional amendment can occur only after *both* chambers have approved the measure by a two-thirds vote. *Cf.* HI CONST. art. III, Sec. 15 ("No bill shall become law unless it shall pass ... each house[.]"). The notice to the governor required by article XVII, section 3 must precede the *second* chamber's vote by at least ten days.

We read the language of article XVII, section 3 as expressing a series of related, straightforward requirements pursuant to which the legislature may propose amendments to the Hawai'i Constitution. The usual legislative process must be followed—three readings, public notices, formal votes, and the like. Because of the significance involved in amending the constitution, however, the framers added two qualifications to the normal legislative process: the enhanced vote requirement—a two-thirds majority—and, finally, formal notice to the governor of the proposed amendment's final form ten days before it is adopted by the legislature.

We hold that the governor must receive at least ten days notice, prior to the second legislative chamber's vote, of a proposed constitutional amendment's final form. The required notice may be given by the Senate, the House, or both.

The procedures followed by the legislature in adopting the six bills challenged in the instant appeal were as follows:

### A. *S.B. 2513: Judicial Selection Committee Terms*

Notice of Senate Bill No. 2513 was given to the governor on March 4, 1994. The Senate first passed the bill on March 8. On April 6, the House passed the bill as H.D. (House Draft) 1 in its final form. The House then gave notice to the governor on April 18. The Senate passed the bill in its final form on May 2 as H.D. 1. Because the Senate passed the bill subsequent to the governor's receipt of ten days notice, S.B. 2513 was passed in compliance with article XVII, section 3.

### B. *S.B. 2182: Senate confirmation of district court appointments*

Notice of Senate Bill No. 2182 was given to the governor on March 4, 1994. The Senate then passed the bill on March 8 as S.D. (Senate Draft) 1. The House passed a version of the bill on April 12, numbered as S.D. 1, H.D. 1, and gave notice to the governor on April 18. Following a conference, both houses passed the bill in its final form as S.D. 1, H.D. 1, C.D. (Conference Draft) 1, on May 2. This final form did not differ from the original Senate version.

Arguing that the governor has no way of knowing in advance that the final version will be identical to an earlier draft, the state's position is that there was no constitutionally sufficient notice from either chamber for S.B. 2182. Defendants counter that the governor was given notice of the bill in its final form almost two months prior to its final passage by both legislative chambers.

As the facts of this case indicate, it is not always clear which version of a bill will be the final form. Each legislative chamber may be working on its own suggested language, and the final text may not be worked out until after a conference is held. Where that is the case, clearly the governor must be given notice at least ten days before at least one house votes on the new language. But the state's position appears to be that, following any conference, there must be renewed notice to the governor and a further ten days before any vote on the conference draft, even where, as here, a bill's final form agreed to at conference is identical to the form of an earlier bill of which the governor was properly notified.

Article XVII, section 3 imposes no such formalistic requirement. The legislature must of course be sure to provide the governor with the constitutionally required notice. Should a conference between the two legislative chambers modify the final form of the proposed text, the governor must receive ten days notice prior to the vote of at least one house. But given the facts of this case, we decline to hold that the governor must always receive renewed notice following a legislative conference, where the Senate and conference drafts of a proposed amendment were identical. The notice given the governor of S.B. 2182 complied with article XVII, section 3.

### C. *S.B. 2515: Judicial Selection Committee Composition*

Notice of Senate Bill No. 2515 was given to the governor on March 4, 1994. The bill first passed the Senate on March 10, and the Senate again gave notice to the governor on that date. On April 6, the House passed the bill. The House then gave notice to the governor on April 18. Following a conference, both legislative chambers passed the bill in its final form on May 2 as H.D. 1, C.D. 1. Because the final form was identical to the original Senate bill, of which the governor received notice on March 4, the legislature complied with article XVII, section 3 in passing S.B. 2182.

### D. *H.B. 3657: Board of Education Powers*

House Bill No. 3657 passed the House on March 8, 1994 as H.D. 2. The Senate passed the bill on April 12 as H.D. 2, S.D. 1. The Senate and the House each gave notice to the

governor on April 18. On May 2, following a conference, each chamber passed a final version of the bill as H.D. 2, S.D. 1, C.D. 1. Each bill was identical to the original House version. The state argues that neither chamber gave the constitutionally required notice. The state also asserts that the notice given was unclear because it identified identical but differently numbered bills. We find no violation of article XVII, section 3.

### E. *H.B. 2692/Act 280: Child Care Revenue Bond*

The House passed H.B. No. 2692 on March 8, 1994, and it gave notice to the governor of H.D. 2 on March 10. The Senate noticed the governor of H.D. 2, S.D. 2 on April 5, and it then passed the bill on April 12. The Senate again gave the governor notice on April 18. On April 29, the House passed the bill in its final form as H.D. 2, S.D. 2. Because the House passed the bill in its final form subsequent to the governor's receipt of ten days notice, we find no violation of article XVII, section 3.

### F. *S.B. 2294: Number of Judicial Nominees*

S.B. No. 2294 first passed the Senate on March 8 as S.D. 2. The House passed the final version of the bill on April 6 as S.D. 2, H.D. 1. Notice was given to the governor by the House on April 18. The Senate again passed the bill in its final form on May 2. Article XVII, section 3 was complied with when the Senate passed the bill after the governor's receipt of ten days notice of its final form.

Our interpretation of article XVII, section 3 is buttressed by the fact that it reflects the long-standing practice of successive legislatures, as well as the executive branch. As the United States Supreme Court observed in *Smiley v. Holm*, 285 U.S. 355, 369, 52 S.Ct. 397, 400, 76 L.Ed. 795 (1932),

> [g]eneral acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political

rights, and hence subject to constant and careful scrutiny.

Among the earliest proposed constitutional amendments, for example, were several made by the legislature in 1964. The procedure followed was similar to that taken in 1994. In passing S.B. No. 7, a proposal to eliminate the literacy qualification for voting, notice was given to the governor on March 6, 1964. The Senate passed the proposal the next day, March 7, and the House approved it on March 21, fifteen days after notice was given. Two other proposals made that year—H.B. No. 253 and H.B. No. 421—followed virtually the same path. And, by the state's count, at least seven and perhaps as many as twenty-one proposed amendments were passed between 1978 and 1993 with only one house giving the governor ten days notice.

Defendants point out that among the legislators at this time were several members who had served on the 1950 Constitutional Convention's Committee on Revision, Amendments, Initiative, Reform and Recall, the very committee that drafted article XVII, section 3. For example, Yasutaka Fukushima, the drafting committee chair, served in 1964, along with fellow constitutional framer Hebden Porteus, on the Senate Judiciary Committee which shepherded these proposed constitutional amendments through the Senate. These members of the legislature were well positioned to make their contrary views known had they disagreed with the legislative interpretation of the notice requirement.

Furthermore, the opinion of the Department of the Attorney General has been sought over the years with specific reference to the notice of proposed constitutional amendments, and until recently that opinion has consistently been that ten days notice prior the vote in the second chamber is constitutionally sufficient. In a "Report to the Governor on Bill Passed by the Legislature" regarding S.B. 7, dated March 30, 1964 and headed "Opinion as to Legality," the attorney general's office stated that "[i]nquiries confirm that the necessary written notice was sent to the Governor by the Senate on March

6, 1964. There appear to be no constitutional or other legal objections to the bill." [8]

In 1972, the same question arose following passage by the legislature of the proposed Equal Rights Amendment. The attorney general's opinion at that time directly rejected the current attorney general's view of the constitutional notice requirement:

> In the instant case, the Governor was given such notice by the Senate on the same date that the Senate passed the bill on third reading. More than ten days elapsed thereafter before the House passed the bill. A question arises as to whether the notice given should have preceded final action in the Senate by ten days. We believe that it was not necessary for the Senate to have given such notice. We read Article [XVII], section 3 to mean that the Legislature as an entity may adopt a proposed constitutional amendment after the Governor has been given ten days notice of the final form of the bill. Under this view the notice need not be given before each house acts on the bill; it must be given before the final action of the Legislature. We believe this view is supported by the wording "... after *either* or both houses shall have given the governor at least ten days' written notice of the *final form* of the proposed amendment."

Department of the Attorney General, "Report to the Governor on Bill Passed by the Legislature," Apr. 18, 1972 (original emphasis). The same opinion was provided by the attorney general in 1975. *See* Department of the Attorney General, "Report to the Governor on Bill Passed by the Legislature," May 13, 1975 ("This bill passed final reading in the Senate on April 3, 1975, and in the House on April 11, 1975. Hence, written notice of the final form of the proposed amendment must have been given to the Governor on *April 1, 1975, at the latest.*" (Original emphasis.)).

Again, while this past practice is not conclusively determinative in interpreting the text of the constitution, it does factor into our analysis.

The state seeks to support its position by resort to the legislative history.

> When resolving ambiguity, we have repeatedly held that the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it. We have also acknowledged, in gleaning the intent of the framers and the people, that an examination of the debates, proceedings and committee reports of the Constitutional Convention is useful. Such evidence, however, does not have binding force on this court and its persuasive value depends upon the circumstances of each case.

*Pray,* 75 Haw. at 343, 861 P.2d at 728 (citations, internal quotation marks, and alterations omitted).

The framers of the constitution provided the following commentary to the relevant portion of article XVII:

> Section 3 of the proposed article provides for initiation of proposed constitutional amendments by the legislature. Two alternative means for doing this are provided:
>
> (a) In order to propose such amendments through action at a single session, *each house must pass the measure in the manner required for ordinary legislation, but with a two-thirds vote of the total membership of each house on final reading and after either or both houses shall have given the governor at least ten days written notice* of the final form of the proposed amendment. The requirement of notice to the governor is to insure at least an opportunity for him and the attorney general to submit to the legislature, if he so desires, any suggestion or objections which seem appropriate to them.
>
> (b) The legislature may also, by adopting such measure in the manner required for ordinary legislation, but by only a majority vote of each house, on final reading, at two successive sessions, regular or special, or both, propose such amendments. No requirement of notice to the governor is prescribed in such case, since the governor and attorney general will have ample time

---

8. Only one formal opinion of the attorney general, No. 64–41, touches on the issue of the notice requirement of article XVII, section 3, and it does not directly address the issue relevant here.

between sessions to consider the proposal and make his view known thereon.

Standing Comm. Rep. No. 48, *reprinted in* 1 *Proceedings of the Constitutional Convention of Hawai['ji 1950: Journals and Documents* at 188 (1960) (emphasis added); *see also id.,* vol. 2. at 771–72. This commentary indicates that the framers of the constitution drafted this provision in order to give the governor "at least an opportunity" to make his or her views known prior to legislative adoption of a proposed amendment. But it sheds no significant light on *when* the notice is to be given.

Finally, the attorney general argues, as a matter of policy, that there is a "possibility of real mischief" in our interpretation of the constitutional requirement:

> Suppose the Governor had enough friends in house A but not in house B to prevent a two-thirds vote on a proposed amendment. If the proposed amendment is introduced in house A, and then crosses over to house B, the Governor ... will receive notice only from house B. It would be notice orchestrated to deprive the Governor of an effective "opportunity" to influence the entire legislature.

Opening Brief at 25. One answer to this concern is to note that, if the governor has enough influence to prevent a two-thirds vote in house A, the proposed constitutional amendment will be defeated there. Another response is simply to point to the constitutional design: the framers placed this power of proposed amendment in the legislature, required a two-thirds vote if done in a single session, and deliberately divested the governor of his veto over such proposals so that they can go before the voters and be approved or rejected at the next election. The focus of this procedure is clearly on the legislature and the voters, and not on guaranteeing that the governor be able to "influence the entire legislature." The governor is ensured of notice and an opportunity to comment during the process, and can then, like any other person, make his or her views known in the course of the ensuing election campaign.

### III. *CONCLUSION*

Based on the foregoing, we hold that we have jurisdiction to hear this appeal. Viewing the evidence in the light most favorable to the state, we hold that the state has failed to demonstrate a plain, clear, manifest, and unmistakable violation of article XVII, section 3 of the Hawai'i Constitution. Therefore, we affirm the trial court's grant of summary judgment in favor of Defendants.