***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCPW-18-0000733
20-DEC-2018
12:37 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

CITY AND COUNTY OF HONOLULU; COUNTY OF HAWAI'I;
COUNTY OF MAUI; COUNTY OF KAUA'I, Petitioners,

vs.

STATE OF HAWAI'I; SCOTT T. NAGO, in his capacity as
Chief Election Officer, Respondents.

SCPW-18-0000733

ORIGINAL PROCEEDING
(CIV. NO. 18-1-1326-08)

DECEMBER 20, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

The right of the people to shape the way in which they are governed through free and fair elections is the basis of our democratic society. At no time is this dynamic more pronounced than when the public is called upon to approve revisions to the Hawai'i Constitution, the foundational document on which our

state government is based. In order for the electorate to effectively exercise this most basic of rights, however, a ballot must be capable of rendering a knowing and deliberate expression of voter choice. Thus, when a constitutional amendment is presented to the electorate for ratification, both our constitution and statutes require that the question posed to voters must be clear and neither misleading nor deceptive. And it is this court's duty to preserve the integrity of the electoral process by invalidating a question that fails to meet this standard.

In this case, several counties of the State of Hawai'i challenged a ballot question authored by the state legislature that would approve an amendment granting the State the authority to impose a surcharge on investment real property. The challengers argue that the ballot question was unclear and likely to mislead or deceive an average voter. Upon review, this court determined that the ballot question as written did not comply with the requirement that its language and meaning be clear and not misleading. We accordingly declared the ballot question invalid, stating at the time that this opinion would follow. We now elaborate as to our reasoning.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Real Property Taxation in Hawai'i

From the beginning of statehood until 1980, the Hawai'i Constitution fully reserved the taxing power to the State, delegable to the counties at the Hawai'i legislature's sole discretion. County of Kaua'i ex rel. Nakazawa v. Baptiste, 115 Hawai'i 15, 20, 165 P.3d 916, 921 (2007) (quoting Haw. Const. art. VII, § 3 (1968)). As a result, a hybrid system of real property taxation developed within the state. Although the counties were statutorily authorized to set the specific tax rates applicable to land within their borders, the State retained all other relevant responsibilities, including the creation of exemptions, the administrative adjudication of tax appeals, and the actual collection of tax funds. See Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 594-95 (1980). After the State was reimbursed for its administrative expenses, all revenues derived from real property taxes were remitted to the counties for their operations. Id. The counties depended heavily on these monetary transfers for their operating income, and by the time of the 1978 Constitutional Convention, the shared responsibility had become a "sore point between counties and the State." 2 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 247 (1980).

3

Prior to the 1978 Convention, county officials began to express frustration that the patchwork of concurrent authority had created confusion and a lack of accountability between the State and counties, with voters unable to determine "what level of government [was] responsible for the real property tax bite." Id.; accord Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 594-95. Further, county officials contended that the counties had differing needs and economic bases that were not fully served by state-wide tax policies, and that it was unfair that the counties were tasked with the full management of local affairs but had little control over their primary source of income. See Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 595; 2 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 247-48.

Responding to these concerns, the delegates adopted a proposed amendment to the Hawaiʻi Constitution granting the counties exclusive authority over all functions related to the taxation of real property.[1] See 1 Proceedings of the

---

[1] The County of Kalawao, which at the time was managed by the State Department of Health and had no local government, was not included in the transfer of power. See 2 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 248.

Constitutional Convention of Hawaiʻi of 1978, at 1198 (setting forth Haw. Const. art. VIII, § 3 as amended).  A report from the Committee on Local Government indicates the transfer was intended to grant the counties full control over their finances, eliminate public confusion as to which level of government was responsible for real property taxes, further the democratic ideal of home rule, and allow the counties flexibility in addressing their unique local needs.  Stand. Comm. Rep. No. 42 in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 595.  The amendment was subsequently approved by Hawaiʻi voters, and article VIII, section 3 of the Hawaiʻi Constitution now states in full as follows:

> The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, with the exception of the county of Kalawao.  The legislature shall have the power to apportion state revenues among the several political subdivisions.

(Emphasis added.)  Thus, only the counties currently possess the constitutional authority to levy a tax on real property within the State of Hawaiʻi.

## B. Senate Bill 2922

On January 24, 2018, Senate Bill 2922 (S.B. 2922) was introduced in the Hawaiʻi State Senate.[2]  S.B. 2922, 29th Leg., Reg. Sess. (2018).  In the section of the bill setting forth proposed legislative findings, the bill stated that article X, section 1 of the Hawaiʻi Constitution requires the State to provide a system of public education.[3]  Id.  The bill noted that Hawaiʻi is unique among the United States in that it funds and administers its public school system at the State level rather than assigning the responsibility to its counties or another local political subdivision.  Id.  Citing a series of government studies that placed Hawaiʻi among the lowest ranked states in the nation for teacher salary and education expenditures, the bill asserted that the State was consistently failing to appropriate adequate revenue for education from the state general fund, which undermined the State's mission of providing a quality education to all of Hawaiʻi's children.  Id.  The bill concluded, "It is necessary to develop a new means of funding Hawaii's

---

[2]     The text of S.B. 2922 as originally introduced is available at https://www.capitol.hawaii.gov/session2018/bills/SB2922_.HTM.

[3]     Article X, section 1 of the Hawaiʻi Constitution provides in relevant part as follows: "The State shall provide for the establishment, support and control of a statewide system of public schools free from sectarian control, a state university, public libraries and such other educational institutions as may be deemed desirable, including physical facilities therefor."

public education system to ensure that the State will be able to prepare children to meet the social and economic demands of the twenty-first century."[4]  Id.

To this end, the bill proposed amending the Hawaiʻi Constitution pursuant to article XVII, section 3 to authorize "the legislature to establish a surcharge on residential investment property" for the purpose of funding public education.[5]  Id.  Following a series of revisions by both legislative chambers, S.B. 2922 was passed in late April 2018.

---

[4]  These proposed findings, which are provided for context, were not included in the final version of the bill passed by the legislature.  See S.B. 2922, S.D.1, H.D.1, 29th Leg., Reg. Sess. (2018), https://www.capitol.hawaii.gov/session2018/bills/SB2922_HD1_.htm.

[5]  Article XVII, section 3 provides in full as follows:

The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.

Upon such adoption, the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.

At such general election the proposed amendments shall be submitted to the electorate for approval or rejection upon a separate ballot.

The conditions of and requirements for ratification of such proposed amendments shall be the same as provided in section 2 of this article for ratification at a general election.

In its final form, the act proposed two changes to the Hawai'i Constitution.

First, the act proposed amending article VIII, section 3 as follows:

> TAXATION AND FINANCE
>
> Section 3.  The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, with the exception of the county of Kalawao[.]; provided that the legislature may establish, as provided by law, a surcharge on investment real property.  The legislature shall have the power to apportion state revenues among the several political subdivisions.

S.B. 2922, S.D.1, H.D.1, 29th Leg., Reg. Sess. (2018) (proposed deletion bracketed and proposed addition underlined).  Second, the bill proposed making the following addition to article X, section 1:

> PUBLIC EDUCATION
>
> Section 1.  The State shall provide for the establishment, support and control of a statewide system of public schools free from sectarian control, a state university, public libraries and such other educational institutions as may be deemed desirable, including physical facilities therefor.  There shall be no discrimination in public educational institutions because of race, religion, sex or ancestry; nor shall public funds be appropriated for the support or benefit of any sectarian or nonsectarian private educational institution, except that proceeds of special purpose revenue bonds authorized or issued under section 12 of Article VII may be appropriated to finance or assist:
>
> 1.  Not-for-profit corporations that provide early childhood education and care facilities serving the general public; and
>
> 2.  Not-for-profit private nonsectarian and sectarian elementary schools, secondary schools, colleges and universities.

> Funding of public education shall be determined by the legislature; provided that revenues derived from a surcharge on investment real property pursuant to section 3 of article VIII shall be used to support public education.

Id. (proposed addition underlined).

Lastly, the act set forth the ballot question to be posed to the electorate for a vote on ratifying the proposed amendment, as is required for enactment under Hawaii Revised Statutes (HRS) § 11-118.5 (2011)[6] and article XVII, section 3 of the Hawai'i Constitution. See supra note 5. The ballot question stated as follows: "Shall the legislature be authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education?" S.B. 2922, S.D.1, H.D.1.

**C. The Circuit Court Action (Civ. No. 18-1-1326-08)**

On August 22, 2018, the City and County of Honolulu filed suit in the Circuit Court for the First Circuit (circuit court) against the State of Hawai'i and various state election officials in their official capacities.[7] The action sought

---

[6]     HRS § 11-118.5 provides in full as follows:

Any constitutional amendment proposed by the legislature shall include in final form the exact constitutional ratification question to be printed on a ballot. The constitutional ratification question shall be phrased in a manner to enable voters to express their choice on the constitutional amendment by providing a "yes" or "no" response. The language and meaning of a constitutional amendment shall be clear and it shall be neither misleading nor deceptive.

[7]     The Honorable Jeffrey P. Crabtree presided.

declaratory and injunctive relief invalidating S.B. 2922 and enjoining the ballot question from being placed on the November 6, 2018 election ballot. In a second amended complaint filed the following week, the Counties of Hawaiʻi, Maui, and Kauaʻi joined the City and County of Honolulu (collectively, the Counties[8]) as additional plaintiffs. Then, on August 31, 2018, the Counties filed a Motion for Preliminary Injunction.[9]

In support of their motion, the Counties argued in their submissions that the S.B. 2922 ballot question was misleading and deceptive in violation of HRS § 11-118.5.[10] They

---

[8] For purposes of clarity, this opinion uses the capitalized "Counties" when referring to the specific litigants in this case and the lower-case "counties" when generally referencing the state's political subdivisions.

[9] Three days before, the Counties filed an ex parte motion to shorten time on the forthcoming Motion for Preliminary Injunction. Although the motion to shorten time is not included in the filings to this court, it appears from the filings in the record that the Counties asserted that the ballots would be submitted for printing on or about September 7, 2018, and thus an expedited schedule would be necessary to prevent the ballot question from being printed should the Counties prevail. With its response, the State included a declaration by the Chief Election Officer. The declaration stated that, while September 7 was the deadline to submit the ballots to the printer, the logistics of compiling and translating over 240 different ballot types in time to comply with procedural safeguards and laws relating to the distribution of absentee ballots had already rendered it impracticable to make substantive changes to the ballots. The Chief Election Officer stated that, should the Counties prevail, he could instead be ordered to issue a proclamation declaring that the ballot question should be considered stricken and any votes for or against it would have no effect.

[10] Before the circuit court, the Counties also argued that the title under which the ballot question was to be printed was deceptive and misleading. Thereafter, the Hawaiʻi Chief Election Officer chose to remove the title entirely, reasoning that it was not legally required. The Counties did not challenge this decision.

In addition to HRS § 11-118.5, the Counties' motion relied on Kahalekai v. Doi, in which this court indicated that the ratification

(continued . . .)

argued that the ballot question's use of the term "surcharge" did not accurately reflect the substantive nature and effect of the proposed amendment, which would be to alter a constitutional provision entitled "Taxation and Finance" to grant a new taxation power to the state legislature. The ballot question also did not indicate that the proposed amendment would fundamentally change the allocation of authority between the State and counties by making the counties' authority over real property taxation nonexclusive, the Counties continued. The Counties additionally argued that the phrase "investment real property" was vague and overbroad in that virtually any purchase of real property could be characterized as an investment. And the Counties contended that the phrase "as provided by law" was misleading because voters may believe it indicated that the proposed practice was already authorized under current law, and in any event they would not know which law was being referred to as a limitation on the legislature's new taxing power. Lastly, the Counties argued that the phrase "to be used to support public education" was likely to mislead voters to believe funding for public education would necessarily increase if the

(. . . continued)

processes prescribed in article XVII of the Hawaiʻi Constitution inherently require that an amendment ballot question be sufficiently clear to allow "a knowing and deliberate expression of voter choice." 60 Haw. 324, 333, 590 P.2d 543, 550 (1979); see infra note 15.

proposed amendment were enacted, which the amendment did not actually require.[11]  A preliminary injunction was appropriate, the Counties concluded, because they were likely to prevail on the merits and the public interest weighed in favor of protecting the integrity of the election.

In its responsive arguments, the State contended that every enactment of the legislature is presumptively valid and the ballot question clearly reflected the nature and effect of the proposed amendment.  "Surcharge" is a well understood term that often appears in statutes, the State argued, and it was properly used in the amendment and ballot question according to its legal definition: "[a]n additional tax, charge, or cost." (Citing Surcharge, Black's Law Dictionary (10th ed. 2014).)  The State further argued that the proposed amendment would not fundamentally change the allocation of power between the State and counties because it would not restrict the counties' power to tax real property; rather, it would simply authorize the legislature to impose a charge in addition to any real property tax imposed by the counties, which the ballot question

_____

[11]     The Counties additionally argued before the circuit court that the process by which the legislature adopted S.B. 2922 was improper, that the amendment should be made only through a constitutional convention, and that the amendment would intrude on the University of Hawai'i's and the Board of Education's autonomy by granting the legislature sole authority to determine funding for public education, which the ballot question did not disclose. These arguments are not raised before this court, and they therefore are not further addressed.

appropriately reflected. Further, the State argued, the phrase "as provided by law" simply indicated that the provision was not self-executing and would require subsequent legislation to be implemented. And even if the question and amendment were unclear, the State argued, a preliminary injunction would nonetheless be inappropriate because the Counties could avail themselves of judicial remedies to invalidate the ballot question after the election if the measure were to pass, and thus there was no risk of irreparable harm. In contrast, the State concluded, ordering a change to the ballot would risk derailing the general election and would deprive the public of its right to vote on the proposed amendment, and the public interest therefore favored denial of the injunction.

The State further clarified its position during a September 7, 2018 hearing on the Counties' Motion for Preliminary Injunction. During the hearing, the State maintained that the surcharge contemplated by the proposed amendment was not itself a tax on real property, but rather an independent tax calculated based on the amount of real property tax imposed by the counties. The legislature is authorized to enact such a fee pursuant to its general taxation power under

article VII, section 1 of the Hawaiʻi Constitution,[12] the State argued, and the term "surcharge" distinguishes this extra fee from a direct tax on real property. There was therefore a "clear, rational basis" for using the word "surcharge" instead of tax, the State concluded, making the choice of language neither deceptive nor unclear.

On September 20, 2018, the circuit court issued its Findings of Fact, Conclusions of Law, and Order Denying Plaintiff Counties' Motion for Preliminary Injunction, Filed on August 31, 2018 (Order Denying Injunction). The court found that the language of the proposed amendment was not deceptive, noting that HRS § 11-118.5 does not require a constitutional amendment to contain a detailed description of all of the issues and possible effects associated with the change. Although the court acknowledged that the proposed language was not as clear as it could have been, the court found that it was clear enough to satisfy HRS § 11-118.5, reasoning that many of the most important constitutional rights are phrased in general or vague terms. The court thus found that the Counties were not likely to prevail on the merits and, in any event, allowing the public to vote on the ballot question would not cause irreparable harm.

---

[12] Article VII, section 1 of the Hawaiʻi Constitution provides as follows: "The power of taxation shall never be surrendered, suspended or contracted away."

14

The court also found that, because the public has both an interest in not allowing a deficient question to appear on the ballot and an interest in voting on properly adopted non-deficient ballot questions, the public interest on each side of the question balanced evenly and did not "tip the scale in favor of issuing the injunction."

The following day, the circuit court certified for interlocutory appeal its Order Denying Injunction and issued a stay of proceedings pending the issue's final resolution.

### D. Petition for Extraordinary Writ

On September 26, 2018, the Counties filed with this court a Petition for Extraordinary Writ Seeking Pre-Election Relief. The Counties explained that they intended to file a "prompt notice of appeal" to challenge the circuit court's Order Denying Injunction, but given the standard rules and deadlines, it would be virtually impossible to present the issue to this court through the normal appellate process prior to the November 6, 2018 general election. The Counties therefore contended that an extraordinary writ was their only practical way to obtain pre-election relief, which this court's precedents establish is strongly preferred in contrast to post-election challenges. (Citing State ex rel. Bronster v. Yoshina, 84 Hawai'i 179, 185, 932 P.2d 316, 322 (1997).) They accordingly requested that this court issue an order to the Chief Election Officer directing him

15

to issue a public proclamation stating that the ballot question should be considered stricken and that any votes for or against the measure would not be counted and would have no impact.

In addition to reiterating their arguments before the circuit court regarding the ways in which the ballot question was misleading, the Counties contended that the point of view of the average voter should be the "touchstone" by which the ballot question's clarity and potential for deception should be measured. The average voter is much more likely to know what a "tax" is than to know what a "surcharge" means, the Counties argued, and it therefore should be impermissible to make no reference to a tax in the ballot question--particularly when the sole purpose of the amendment is to raise government revenue. The Counties asserted that the use of the alternate term "surcharge" was deceptive, suggesting that it was likely motivated by a desire to circumvent the average voter's reluctance to approve new taxes.

On October 4, 2018, this court directed the State respondents to file an answer to the Counties' petition. In its response, the State restated its arguments that the ballot question and amendment were neither deceptive nor misleading. The State also argued that the petition should be denied because the Counties were improperly seeking a more favorable forum to relitigate a matter that had been decided against them in the

16

circuit court action. The State further contended that, if construed as a petition for a writ of mandamus directed at the circuit court, the Counties' petition was an attempt to circumvent the required appellate procedures. The circuit court properly exercised its discretion in denying the preliminary injunction, the State continued, and an extraordinary writ should not be used to interfere with or control a trial court's decision-making even when the decision is erroneous.[13]

This court heard oral argument on October 18, 2018, and the following day we issued an order granting the Counties' petition, declaring the ballot question invalid, and directing the Chief Election Officer to issue a public proclamation stating that no votes for or against the measure would be counted or have any impact. Our order deferred issuance of the present opinion due to the time constraints.

---

[13] The State also contended that two of the Respondents, Senate President Ronald D. Kouchi and Speaker of the House Scott K. Saiki, were improperly named in the petition because the Counties had failed to state a claim for relief against them. The Counties argued in reply that the legislators were properly joined in the action to allow them an opportunity to be heard on the issue. During oral argument in this case, counsel for the Counties indicated that they had no objection to the dismissal of the legislators, who had chosen not to appear. Oral Argument at 00:08:45-00:09:05, City & Cty. of Honolulu v. State of Hawai'i (No. SCPW-18-733), http://oaoa.hawaii.gov/jud/oa/18/SCOA_101818_SCPW_18_733.mp3. This court issued an order dismissing the two legislative respondents on October 19, 2018.

## II. DISCUSSION

### A. The Propriety of an Extraordinary Writ

The State urges that, notwithstanding any error on the part of the circuit court, an extraordinary writ is inappropriate under the circumstances.  This court has indeed often stated that an extraordinary writ will not be issued when alternative relief is available.  See, e.g., State ex rel. Marsland v. Ames, 71 Haw. 304, 307, 788 P.2d 1281, 1283 (1990); Sapienza v. Hayashi, 57 Haw. 289, 293, 554 P.2d 1131, 1135 (1976).  As such, an extraordinary writ is not a substitute for an appeal, and it will not lie to control a trial court's discretion even when that discretion is exercised in error. Honolulu Advertiser, Inc. v. Takao, 59 Haw. 237, 241, 580 P.2d 58, 62 (1978).

Nevertheless, we have seen fit to depart from this rule in "rare and exceptional situations" in which "the special and exigent circumstances of the particular case" compel this court to act.  Sapienza, 57 Haw. at 293, 554 P.2d at 1135.  In Sapienza v. Hayashi, for instance, a trial court judge issued an order disqualifying the entire City and County of Honolulu Prosecutor's Office from participating in a grand jury inquiry because the City Prosecutor was a political appointee of the Mayor who was accused of wrongdoing in the underlying matter. 57 Haw. at 291-92, 554 P.2d at 1133-34.  Upon being petitioned

18

for extraordinary relief, this court held that the order was overbroad. Id. at 293, 554 P.2d at 1135. Although the trial court's order was presumably subject to challenge through normal appellate procedures, this court reasoned that "[t]o allow the matter to rest until the appeals process has run its course would forestall the expeditious presentation of legitimate criminal charges to the grand jury by the prosecuting attorney." Id. at 294, 554 P.2d at 1135. "Obviously, this would not be in the public interest," we stated, "and [it] would work upon the public irreparable harm." Id. This court thus held that issuance of an extraordinary writ was appropriate. Id. at 293, 554 P.2d at 1135; see also Gannett Pac. Corp. v. Richardson, 59 Haw. 224, 226-27, 580 P.2d 49, 53 (1978) (holding that news media representatives were entitled to issuance of an extraordinary writ in their challenge to a district court's closure to the public of a high profile preliminary hearing notwithstanding the representatives' failure to appeal a previous denial of a petition for the same relief filed in circuit court "because it appear[ed] to us only too clear that the district courts [were] in immediate need of direction from this court on a procedural and substantive matter of public importance").

Even if the Counties had sought to expedite an appeal of the circuit court's order through normal channels, they could

not have obtained final resolution of this matter before the November 6 general election given the timeline established by our court rules governing appellate procedure. See Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 28 (2016) (setting forth the required timeline for briefing cases on appeal); HRAP Rule 11(b)(1) (2016) (providing the time limit for the assembly, certification, and filing of the record on appeal). Had the normal appeal process been followed, this court would have had the authority to grant post-election relief by invalidating the results of a ballot question, and the Counties thus would not have been entirely without alternative relief if the amendment had been ratified during the pendency of this case. See, e.g., Taomae v. Lingle, 108 Hawaiʻi 245, 250, 118 P.3d 1188, 1193 (2005) (invalidating constitutional amendment following ratification by the electorate because the State defendants failed to follow constitutionally mandated procedural requirements prior to the vote); Watland v. Lingle, 104 Hawaiʻi 128, 132-33, 85 P.3d 1079, 1083-84 (2004) (same).

However, our precedents make clear that pre-election challenges are favored whenever feasible. See State ex rel. Bronster v. Yoshina, 84 Hawaiʻi 179, 185, 932 P.2d 316, 322 (1997) ("[T]he better practice would have been to expedite legal action prior to the election." (citing Blair v. Cayetano, 73 Haw. 536, 836 P.2d 1066 (1992)). The reasons for this

preference for pre-election challenges are myriad. Resolving legal challenges to a ballot's validity before an election generally conserves public resources and discourages gamesmanship by preventing litigants from "gambl[ing] on the outcome of the election contest then challeng[ing] it when dissatisfied with the results." Id.

But more importantly, settling such challenges before the votes are tallied protects the integrity of our most sacred democratic institutions. The right of the citizenry to shape the way in which it is governed through free and fair elections is "the foundation of our representative society." Hayes v. Gill, 52 Haw. 251, 269, 473 P.2d 872, 883 (1970). Just as actual arbitrary or artificial restrictions on that right undermine the true "legitimacy of representative government," id. (citing Kramer v. Union Free School District No. 15, 395 U.S. 621, 626 (1969)), the appearance that the right is being denied undermines public perceptions of legitimacy on which our system is equally dependent. No matter how justified a court may be in setting aside the results of a popular election, such an action may be perceived as a subversion of the directly expressed will of the people. See Watland, 104 Hawaiʻi at 143, 85 P.3d at 1094 (Acoba, J., concurring) ("Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability

requires." (quoting Bush v. Gore, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring))). Invalidating an electoral result thus threatens public confidence in both the efficacy of voting and the independence of our justice system, and this risk of irreparable harm is to be avoided if practicable.

In light of the concerns inherent in the after-the-fact invalidation of a democratically approved ballot measure, we hold that it was in the public interest to resolve this case prior to the November 6, 2018 general election, and we therefore turn to the merits of the Counties' petition for extraordinary relief.

## B. The Proposed Amendment and Ballot Question

Article XVII of the Hawai'i Constitution sets forth two alternative processes by which the constitution may be amended. See Haw. Const. art. XVII, § 1. Under the first, amendments can be proposed through a constitutional convention called by a majority vote of the electorate. Haw. Const. art. XVII, § 2. Under the second, the legislature may propose amendments through either a two-thirds vote of each house or a simple majority vote during two successive legislative sessions. Haw. Const. art. XVII, § 3. In either case, proposed amendments must be submitted to and ratified by the electorate before they are formally incorporated into the Hawai'i Constitution. Haw. Const. art. XVII, §§ 2-3.

22

This court considered the details of this ratification requirement in Kahalekai v. Doi, 60 Haw. 324, 590 P.2d 543 (1979). In Kahalekai, the plaintiffs argued that a series of proposed constitutional amendments that had been approved by a majority vote of the electorate were not validly ratified due to the format of the ballot, which they contended made it inherently more difficult for a voter to mark a "no" vote than a "yes" vote. 60 Haw. at 331–32, 590 P.2d at 549. In reviewing the plaintiffs' challenge, this court stated that it was nearly impossible to eliminate all possible bias from the layout of a ballot, as even basic formatting choices, such as listing candidates in alphabetical order, could arguably favor some contenders over others. Id. at 332 n.4, 590 P.2d at 549 n.4. Rather than imposing "an impractical standard of perfection," id., the court indicated that the constitution's use of the term "ratification" inherently implies the informed, purposeful approval of the amendment by the electorate. Id. at 333, 590 P.2d at 550.

Thus, reasoned the Kahalekai court, the pivotal inquiry is whether the ballot generates "a knowing and deliberate expression of voter choice." Id. The "broad authority" to propose amendments for ratification, we elaborated, "is subject to the limitation that the ballot must enable the voters to express their choice on the amendments

23

presented and be in such form and language as not to deceive or mislead the public."[14]  Id. at 338, 590 P.2d at 552-53.  The court stated that this requirement can be met in part by the provision of supplemental voter information regarding the context and implications of a proposed amendment.  Id. at 339-40, 590 P.2d at 553-54.  "[W]here information placed before the electorate is neither deceptive nor misleading," we held, "and they are given sufficient time within which to familiarize themselves with the contents and effect of the proposed amendments, they will be deemed to have cast informed ballots."  Id. at 339-40, 590 P.2d at 553.

Kahalekai appears to have significantly informed the Hawai'i State Legislature's 1996 enactment of various statutory requirements related to the ratification of proposed constitutional amendments.  See 1996 Haw. Sess. Laws Act 173, §§ 1-3 at 391-93.  Notably, the Act closely tracked language in Kahalekai in setting forth the rule that, when proposed by the legislature, "[t]he language and meaning of a constitutional

_____

[14]  Although Kahalekai appeared to rely on the "ratification" language in what is now article XVII of the Hawai'i Constitution, the court also approvingly cited Kohler v. Tugwell, in which the federal district court indicated a similar requirement inheres in notions of due process.  See 292 F.Supp. 978, 981 (E.D. La. 1968) ("The procedure followed by Louisiana does not deprive the plaintiffs of Due Process for it is sufficient that Louisiana's voters were informed by the ballot of the subject of the amendment, were given a fair opportunity by publication to consider its full text, and were not deceived by the ballot's words."), aff'd, 393 U.S. 531 (1969).

amendment shall be clear and it shall be neither misleading nor deceptive."[15]  HRS § 11-118.5.

Thus, proposed amendments and their corresponding ballot questions are both constitutionally and statutorily required to be phrased in clear language that is not likely to deceive or mislead voters as to their nature and effect.[16]  We

_____

[15]  It is noted that, by its plain text, HRS § 11-118.5 refers to "the language and meaning of a constitutional amendment" rather than the language and meaning of the corresponding ballot question submitted to the voters for approval or rejection of the proposed constitutional amendment. We nonetheless hold that, given the clear parallels between HRS § 11-118.5 and our holding in Kahalekai, the legislature intended the statute to incorporate our precedent requiring that a ballot question be neither misleading nor deceptive.  The litigants appear to have presumed this interpretation to be correct throughout the proceedings in this case, and no party has argued that HRS § 11-118.5 is inapplicable to the S.B. 2922 ballot question.

Along with establishing HRS § 11-118.5, the 1996 Act also tasked the Chief Election Officer with "coordinat[ing] the preparation of appropriate voter education materials with the legislative reference bureau," including "[a] summary, factsheet, and digest of the proposed constitutional amendment" that specified the amendment's purpose, intent, and ramifications, as well as arguments for and against ratification.  See 1996 Haw. Sess. Laws Act 173, §§ 2-3 at 392-93.  This requirement was repealed in 2003, however, see 2003 Haw. Sess. Laws Act 8, § 1 at 16, and the ballot question itself is now the only statutorily required mechanism for providing voters with sufficient information to express a knowing and deliberate choice regarding ratification, as is constitutionally required.  Kahalekai, 60 Haw. at 333, 590 P.2d at 550.

[16]  In considering the validity of amendments proposed by the legislature, this court has stated that "every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt."  Blair v. Cayetano, 73 Haw. 536, 542, 836 P.2d 1066, 1069 (1992) (quoting Schwab v. Ariyoshi, 58 Haw. 25, 31, 564 P.2d 135, 139 (1977)).  We note that proposed amendments and their corresponding ballot questions are not statutes, and the Counties' challenge is based at least in part on statutory rather than constitutional grounds.  Nevertheless, article XV, section 3 of the Hawai'i Constitution specifically entrusts the legislature with the power to propose amendments, and courts owe deference to their coequal branch of government in its performance of constitutionally assigned functions.  Thus, we will act to invalidate a legislatively proposed amendment or ballot question only when it is clearly incompatible with a statutory or constitutional mandate.  See id.

therefore consider whether this standard is met by the ballot question: "Shall the legislature be authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education?"  In making this determination, we consider how the average lay voter would interpret the ballot question.[17]  W. Petroleum Importers, Inc. v. Friedt, 127 Wash.2d 420, 424, 899 P.2d 792, 794-95 (1995) (quoting Estate of Turner v. Dep't of Rev., 106 Wash.2d 649, 654, 724 P.2d 1013, 1015 (1986)).

**1. The Ballot Question Is Unclear and Inherently Misleading in That It Does Not Disclose the Nature of the Proposed Change to the Constitution.**

It is fundamental that, to provide a voter "with sufficient information to make an informed decision about the true nature of the proposed constitutional amendment," a ballot question must "at least put [voters] on notice of the changes being made" to the constitution.  In re Initiative Petition No. 409, 376 P.3d 250, 252, 254 (Okla. 2016) (addressing requirements for the "statement of the gist of the proposition" included in the header of an initiative petition proposing a constitutional amendment); see also HRS § 11-118.5 ("The language and meaning of a constitutional amendment shall be

_____

[17] Based on the declaration by the Chief Election Officer, the full text of the amendment at issue in this case would have been available to voters upon request.

26

clear . . . ." (emphasis added)). "When the major effect of a proposed measure would be a substantive change in existing law, the ballot [] should inform the reader of the scope of the change." Rasmussen v. Kroger, 351 Or. 195, 198 (2011).

In some instances, this necessary information will not be self-evident. For example, a proposal to establish a new governmental power or limitation suggests by negative implication that no such power or limitation exists under current law. Cf. Sprague v. Cortes, 636 Pa. 542, 564 (2016) (opinion of Todd, J.) ("By omitting any indication that there is a current mandatory retirement age in the Constitution, the plain import of the unadorned ballot question language is that a brand new provision requiring all judges of the Commonwealth to retire at age 75 is being added." (emphases added)). When this implication creates an inaccurate or incomplete impression of the law, the failure of the ballot to correct the misconception will render it unclear, misleading, and deceptive. As stated by Justice Todd of the Pennsylvania Supreme Court,

> In everyday human interaction, in the arts and literature, as well as in legal documents, statutes, and constitutional provisions which govern our day-to-day affairs, there is a categorical difference between the act of creating something entirely new and altering something which already exists. Language which suggests the former while, in actuality, doing the latter is, at the very least, misleading, and, at its worst, constitutes a ruse.

Id. at 556–57.

27

A number of courts from other jurisdictions have drawn such a distinction when considering the validity of ballot measures aimed at amending existing law. In Askew v. Firestone, for example, the Supreme Court of Florida considered a legislatively proposed change to a provision of the state constitution that prohibited elected officials from lobbying for two years after leaving office. 421 So.2d 151, 152-53 (Fla. 1982). The proposal would have amended the provision to instead permit such lobbying when the former public official first filed a full public disclosure statement. Id. at 153. The legislative description of the amendment to be placed on the ballot would have informed voters that the amendment prohibited "former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests." Id.

In holding the ballot description invalid, the Florida Supreme Court observed that the "ballot summary neglect[ed] to advise the public that there [was] presently a complete two-year ban on lobbying before one's agency." Id. at 155. The Askew court explained that, although the ballot accurately stated that the amendment would "require the filing of financial disclosure before anyone may appear before any agency for the two years

28

after leaving office," the description did not disclose the "amendment's chief effect," which was "to abolish the present two-year total prohibition." Id. (emphasis omitted). The court thus stated, "The problem . . . lies not with what the summary says, but, rather, with what it does not say." Askew, 421 So.2d at 156.

The Florida Supreme Court held that the description failed "to give fair notice" that it would establish "an exception to a present prohibition." Id. The ballot was therefore "misleading to the public concerning material changes to an existing constitutional provision," the court concluded. Id.; see also Wadhams v. Bd. of Cty. Comm'rs of Sarasota Cty., 567 So.2d 414, 416 (Fla. 1990) (holding that a ballot that informed voters solely of how the amended constitutional provision would read if the amendment was approved was invalid for failing to disclose the language or effect of the provision prior to amendment); Lane v. Lukens, 48 Idaho 517 (1929) (holding that a ballot question that asked whether the state constitution should be amended such that the terms of office of various officials "shall be limited to four years" was invalid for failing to disclose that terms were already limited to two years under then-existing law).

Such is the case with the S.B. 2922 ballot question. By asking the voter only whether "the legislature [shall] be

authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education," the ballot question suggests surcharges on investment real property are not authorized under current law.[18] But this implication provides an inaccurate picture of the law as it stands and the manner in which it would be altered by the proposed amendment.

Under article VIII, section 3 of the Hawaiʻi Constitution, the counties currently have the exclusive authority to tax real property within the State of Hawaiʻi.  As stated, the ballot question reads as follows: "Shall the legislature be authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education?"  The question contains no information from which a voter could ascertain that the counties already have the constitutional authority to impose the property tax at issue and, consequently, that the "chief effect" of the amendment would be to allow two different government entities to tax the same property.  Askew, 421 So.2d at 155.  Thus, as in Askew, the amendment does not give notice that it would establish "an

_____

[18]    Alternatively, as discussed below, a voter could read the phrase "as provided by law" to imply that specifically the state legislature is already empowered to establish the surcharge at issue and therefore infer that a vote in favor of the provision would preserve the status quo.  See infra section II.B.2.c.

exception to a present prohibition,"--namely, the current prohibition on the State taxing real property. 421 So.2d at 156; see also Kahalekai, 60 Haw. at 338 n.7, 590 P.2d at 553 n.7 ("[T]he ballot should contain a description of the proposition submitted in such language as to constitute a fair portrayal of the chief features of the proposition, in words of plain meaning, so that it can be understood by persons entitled to vote." (emphasis added) (quoting Wright v. Bd. of Trustees of Tatum Indep. Sch. Dist., 520 S.W.2d 787, 792 (Tex. Civ. App. 1975))).

Indeed, to fully appreciate the scope of the proposed change, a voter would need to know that the Hawai'i Constitution provides independent taxing power to the counties; that the constitution currently allows only the counties to tax real property to the exclusion of all other government entities; and that the proposed amendment would make an exception to this exclusive authority of the counties by granting the State concurrent authority to tax what is presumably a subset of real property. None of this information is conveyed by the ballot question, which is instead likely to leave the average lay voter with the false impression that a vote in favor of the amendment would allow investment real property to be taxed in the first

instance.[19]  The ballot question is thus "misleading to the public concerning material changes to an existing constitutional provision."[20]  421 So.2d at 156.

If the legislature believes that an exception should be made to the constitutional prohibition placed upon the State as to the imposition of property taxes in order to fund public education, it is appropriate for the legislature "to ask the citizens to modify that prohibition.  But such a change must stand on its own merits . . . ."  Id.  The dearth of information contained in the S.B. 2922 ballot question does not reveal the true effect of the proposed amendment, and the average lay voter may be duly misled as a result.  This alone would be sufficient to hold that the ballot question is clearly incompatible with

_____

[19]    The necessary context could have been concisely conveyed by asking, for example: "Should the exclusive authority of the counties to tax real property provided in the constitution be amended to also provide authority to the State legislature to establish a surcharge on investment real property?"

[20]    The State alternatively contended in the circuit court and during oral argument that, because the fee contemplated by the proposed amendment would be a surcharge on the property taxes collected by the counties rather than an independent tax imposed directly upon real property, the State is already constitutionally authorized to enact such a fee pursuant to its general taxation power.  Assuming arguendo that the State's interpretation is accurate, it would appear to render the proposed amendment superfluous as it would grant no powers to the State that it does not currently have.  Further, it would make the language of the amendment, which states the surtax is to be imposed on "real property" rather than on real property taxes, inaccurate.  And, the discussed implication of the ballot question--that the State is not authorized to impose the discussed surcharge under current law--would also be incorrect.  Given the difficulties and inconsistencies that arise under the State's argued interpretation, we again can hardly say that the ballot question is sufficient to inform the average voter of the scope of the proposed change.

the requirements of HRS § 11-118.5 and article XVII of the Hawai'i Constitution. The deficiency is even more pronounced when viewed in light of the multiple other incidental ways in which the language of the ballot question is unclear or confusing.

## 2. The Language and Effect of the Ballot Question is Potentially Confusing in a Number of Other Ways.

There are a number of additional ways in which the amendment and its corresponding ballot question, "Shall the legislature be authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education?" are likely to confuse or mislead the average lay voter. When these ambiguities and concerns of potential misapprehension are considered together and in conjunction with the ballot question's failure to disclose the overarching nature of the change it would enact, the problematic nature of the ballot question is only magnified.

### a. "Surcharge"

Relying on Boyd v. Jordan, 35 P.2d 533 (Cal. 1934), the Counties argue that it is misleading to ask voters to authorize a new tax without ever using the term "tax." In Boyd, a constitutional amendment was proposed by citizens' initiative that would have overhauled California's tax system by, inter alia, allowing the State to impose a tax on all gross receipts.

Id. at 471-72.  In considering the validity of the initiative's short title, "Initiative Measure Providing for Adoption of Gross Receipts Act," the California Supreme Court noted that "[t]he essential features . . . and the sole purpose of the proposed measure, is to levy a tax to maintain the state and its political subdivisions."  Id. at 471-72.  Because "[t]he short title used in this petition ma[de] no reference to a tax or to the fact that the proposed amendment [was] a revenue measure," the court held that the title demonstrated neither the nature nor subject of the petition, and it was therefore likely to mislead the electors who were asked to sign the initiative.  Id. at 472; see also Walton v. McDonald, 97 S.W.2d 81, 82 (Ark. 1936) (invalidating a ballot entitled "An Act to provide for the assistance of aged and/or blind persons and funds therefor, the administration and distribution of same, penalties for the violation of Act, and for other purposes" for failing to disclose that the measure would impose a series of taxes).

In this case, the parties dispute whether the amendment would in fact authorize the imposition of a tax on real property.  The State argues that, because the additional charge would be levied on the real property taxes imposed by the counties, it was appropriate for the legislature to use the word "surcharge"--a commonly used term meaning "[a]n additional tax, charge, or cost."  (Citing Surcharge, Black's Law Dictionary

(10th ed. 2014).)  But this is contrary to the plain text of the amendment and ballot question, which ask voters to authorize the legislature to establish "a surcharge on investment real property"--not on real property taxes imposed by the counties. If the amendment would indeed allow the State to impose an independent tax on real property, it is apparent that the term surcharge does not obviously convey this meaning.  See Boyd, 35 P.2d at 534.  If, instead, the amendment would authorize only a dependent, supplemental charge added to an existing tax, the ballot question fails to accurately state upon what basis the surcharge will be calculated and levied.  In either event, the language and effect of the amendment and ballot question cannot be said to be clear in this regard as HRS § 11-118.5 requires.

### b. "Investment Real Property"

The Counties also challenge the legislature's failure to define the term "investment real property" in the ballot question and amendment.  Pointing out that earlier versions of S.B. 2922 specifically limited the provision to property "for which the owner does not qualify for a homeowner's [tax] exemption," the Counties contend that virtually any real property can be considered a form of investment in the absence of such a limitation.  (Citing S.B. 2922, 29th Leg., Reg. Sess. (2018) and S.B. 2922, S.D.1, 29th Leg., Reg. Sess. (2018).)  The amendment and ballot question is therefore misleading and

35

deceptive, the Counties argue, in that it falsely conveys to voters that the surcharge would be limited to a subset of real property that does not include personal residences when in reality the amendment would permit the legislature to tax all real property.

This court has specifically stated that "real estate may be purchased with an intent to reside on the parcel of property and, concurrently, with an intent to hold the property in anticipation of an appreciation in the parcel's resale value." Cieri v. Leticia Query Realty, Inc., 80 Hawaiʻi 54, 67, 905 P.2d 29, 42 (1995). We accordingly held that "the plain and obvious meaning of the term 'personal investment' includes real estate or residences." Id. It would thus appear that the plain language of the amendment, considered in isolation, would allow the legislature to tax virtually any real property.[21] Indeed, the State contended during oral argument that, if the amendment were enacted, determining what real property qualified as an

---

[21] In practice, this court interprets a constitutional provision in harmony with other constitutional provisions and "in the light of the circumstances under which it was adopted." Hanabusa v. Lingle, 105 Hawaiʻi 28, 32, 93 P.3d 670, 674 (2004) (quoting Blair v. Harris, 98 Hawaiʻi 176, 179, 45 P.3d 798, 801 (2002)).

investment subject to the surcharge would fall within the discretion of the legislature.[22]

Yet this is not the impression conveyed by the amendment's and ballot question's use of the term "investment real property."  If the amendment was meant to grant the legislature the unrestrained discretion to tax any real property, it could have achieved this effect without employing the word "investment."  By qualifying the "real property" that the surcharge would apply to with the term "investment," the amendment and ballot question suggest that the legislature would be empowered to impose the surcharge on only some real property--namely, non-owner-occupied real estate acquired solely to generate revenue for the property owner.  To the extent this implication is inaccurate, the ballot question is unclear and misleading.

### c. "As Provided By Law"

The Counties further argue that the ballot question's and amendment's use of the phrase "as provided by law" is deceptive and misleading in that the average lay voter is likely to believe the legislature is already authorized under current law to impose the contemplated surcharge.  The State responds

---

[22]     Oral Argument at 00:34:27-00:34:34, City & Cty. of Honolulu v. State of Hawaiʻi (No. SCPW-18-733), http://oaoa.hawaii.gov/jud/oa/18/SCOA_101818_SCPW_18_733.mp3.

that the phrase merely indicates that the provision is not self-executing and would require implementing legislation once enacted.

The expression "as provided by law" appears throughout the Hawaiʻi Constitution, and this court has in the past recognized that the construction is inherently ambiguous. In some instances, "a reference to a right being exercised 'as provided by law' may reflect an intent that implementing legislation is anticipated." Cty. of Hawaiʻi v. Ala Loop Homeowners, 123 Hawaiʻi 391, 412, 235 P.3d 1103, 1124 (2010). In State v. Rodrigues, for example, this court considered article I, section 11, which provides that "[w]henever a grand jury is impaneled, there shall be an independent counsel appointed as provided by law" whose term and compensation are "as provided by law." 63 Haw. 412, 414, 629 P.2d 1111, 1113 (1981). Upon review, we held that the framers had used the phrase "as provided by law" to indicate "further legislation was required to implement the amendment." Id. at 416, 629 P.2d at 1114.

In other contexts, however, the use of "as provided by law" in a constitutional provision may be "simply referring to an existing body of statutory and other law on a particular subject." Ala Loop Homeowners, 123 Hawaiʻi at 412, 235 P.3d at 1124. In United Public Workers, AFSCME, Local 646, AFL-CIO v. Yogi, for instance, this court held that, in guaranteeing the

38

right of public employees "to organize for the purpose of collective bargaining as provided by law," the provision now codified as article XIII, section 2 was intended to incorporate the body of "pre-existing federal and state statutes, constitutional provisions, and court cases which give meaning to the term 'collective bargaining.'" 101 Hawai'i 46, 51, 62 P.3d 189, 194 (2002).

To determine in which sense the phrase was intended, this court considers the history of the provision in addition to its plain language. Ala Loop Homeowners, 123 Hawai'i at 412–13, 235 P.3d at 1124–25. The average lay voter, however, does not have the benefit of reviewing the legislature's or framers' committee reports while in the voting booth and must rely on the language of the amendment and ballot question to determine the words' intended meaning.

In general, the phrase "as provided by law" follows the portion of the constitutional provision that is defined by some other sources of law. When article I, section 11 specifies that "[w]henever a grand jury is impaneled, there shall be an independent counsel appointed as provided by law," for instance, it is the appointment process of the independent counsel that is implemented through legislation. Similarly, in article XIII, section 2's guarantee of the right to "collective bargaining as

provided by law," it is the collective bargaining that is defined through the body of relevant statutes and case law.[23]

Thus, based on the natural reading of the question "Shall the legislature be authorized to establish, as provided by law, a surcharge on investment real property to be used to support public education?" it is not the surcharge on investment real property that is defined by some other source of law, but rather the legislature's authorization to establish such a surcharge. In other words, the placement of the phrase within the ballot question may lead the average lay voter to believe that the legislature is already authorized by some other source of law to impose the surcharge at issue and that a vote in favor of the amendment maintains the status quo.[24] Given this likely confusion, the Counties are correct that the language of the amendment and ballot question is unclear and misleading in this respect.

---

[23] See also, e.g., Haw. Const. art. IX, § 3 (empowering the State to provide social services to "persons who are found to be in need of and are eligible for such assistance and services as provided by law"); Haw. Const. art. XVI, § 3.5 (calling for "a commission on salaries as provided by law").

[24] This misconception is further reinforced because the concept of implementing legislation is already embodied in the ballot question's reference to "the legislature" "establish[ing]" the contemplated surcharge. In other words, had the ballot question simply read, "Shall the legislature be authorized to establish a surcharge on investment real property to be used to support public education?" it would have wholly conveyed that the amendment would allow the legislature to enact subsequent legislation imposing the surcharge in question. The phrase "as provided by law" is redundant in achieving this result, and the average lay voter may assign other significance to its inclusion in order to make the clause non-superfluous.

### d. "To Support Public Education"

Lastly, the Counties contend that the ballot question's reference to "support[ing] public education" is likely to mislead the average lay voter into believing state spending on public education will necessarily increase if the amendment is enacted, when in actuality the amendment does not require a net increase in education spending. The State responds that the funds raised through the surcharge would be required to be used to fund public education, as the ballot question indicates. But, as the Counties aptly argue, "[m]oney," including the legislature's budgetary expenditures, "is fungible." Holder v. Humanitarian Law Project, 561 U.S. 1, 31 (2010). An increase in funding from one source, including the proposed surcharge, can be offset by a decrease from other sources. Indeed, the State acknowledged during oral argument that, should the amendment be enacted, nothing would prevent the legislature from funding public education entirely through revenues raised through the surcharge while repurposing all other funds.[25]

An entreaty "to support public education" is "an appeal to all humane instincts," and a voter would not be

---

[25] Oral Argument at 00:45:54, City & Cty. of Honolulu v. State of Hawaiʻi (No. SCPW-18-733), http://oaoa.hawaii.gov/jud/oa/18/SCOA_101818_SCPW_18_733.mp3.

unreasonable in assuming that such a measure would in fact result in an increase in funding for public education.  Walton, 97 S.W.2d at 82.  Yet by its plain text, the ballot question and amendment make no such guarantee, and no explanatory materials were provided that would dispel this misconception.

The legislature in its wisdom enacted HRS § 11-118.5 to ensure that the language of a proposed amendment and ballot question clearly conveys the amendment's meaning when feasible. When it becomes apparent, however, that practical textual constraints in stating the ballot question may prevent it from being set forth with the specificity or clarity necessary to prevent the average voter from forming an incorrect impression, the legislature should consider whether complementary materials may aid in clarifying the decision voters are to be tasked with making.[26]

---

[26]  This court has in the past noted that supplemental materials similar to those that the Chief Election Officer was formerly tasked with preparing are an effective method of informing the electorate of the details of proposed amendments.  See supra note 15; Kahalekai, 60 Haw. at 340 n.9, 590 P.2d at 554 n.9 ("We think the 'Con-Con Summary' was an excellent method of informing the voter of the proposed amendments.  The Convention, however, could have devoted more space than it did to a comparative analysis of the substantive effect of the proposed amendments.").  However, when the ballot question fails to appropriately disclose the scope and effect of the proposed change, even providing supplemental voter materials will not serve to cure the deficiency as may be possible in instances where optimum specificity or clarity is not present.  See supra section II.B.1.

### III. CONCLUSION

The Hawai'i Constitution vests "broad authority" in the legislature to propose amendments to its provisions to be ratified by the electorate.  Kahalekai v. Doi, 60 Haw. 324, 338, 590 P.2d 543, 552-53 (1979).  "But such a change must stand on its own merits" and "cannot fly under false colors."  Askew v. Firestone, 421 So.2d 151, 156 (Fla. 1982).  As the legislature recognized in enacting HRS § 11-118.5, the provisions of our constitution are of such foundational importance that the utmost care must be taken to apprise citizens of the effect of their vote on a proposed constitutional amendment.  When the language or effect of a proposed amendment or its corresponding ballot question is unclear, misleading, or deceptive, the ballot is not capable of generating the "knowing and deliberate expression of voter choice" necessary for ratification.  Kahalekai, 60 Haw. at 333, 590 P.2d at 550.  The ballot question in the present case is flawed in not presenting the information necessary to produce such a choice, and this court thus invalidated the ballot question in accordance to our law.

| | |
|---|---|
| Donna Y.L. Leong | /s/ Mark E. Recktenwald |
| Robert M. Kohn | |
| Nicolette Winter | /s/ Paula A. Nakayama |
| for petitioner | |
| City and County of Honolulu | /s/ Sabrina S. McKenna |
| | |
| Brian A. Bilberry | /s/ Richard W. Pollack |
| for petitioner | |
| County of Maui | /s/ Michael D. Wilson |



Laureen L. Martin
for petitioner
County of Hawaiʻi

Matthew M. Bracken
For petitioner
County of Kauaʻi

Russell A. Suzuki
Valri Lei Kunimoto
Patricia Ohara
for respondent

Thomas Yamachika
for amicus curiae
Tax Foundation of Hawaiʻi